IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

CLARENCE JAMISON                                                    PLAINTIFF

VERSUS                                                      3:16CV595-CWR-LRA

NICK MCLENDON,
In His Individual Capacity                                          DEFENDANT

<u>MEMORANDUM IN OPPOSITION TO MOTION
[DOC. 46] FOR SUMMARY JUDGMENT</u>

COMES NOW the Plaintiff, Clarence Jamison, by and through counsel of record

and files his Memorandum in Opposition to Motion [Doc. 46] for Summary Judgment.

For cause, Mr. Jamison shows the Court as follows:

I.      STATEMENT OF FACTS

On July 29, 2013, Clarence Jamison found himself traveling home, to Neeses,

South Carolina, after vacationing in Las Vegas, Nevada and Phoenix, Arizona.  (Jamison

Dep. at 44-45.)  Mr. Jamison was driving a 2001 model silver Mercedes Benz C Class

convertible which he had finalized the purchase of and picked up on July 16, 2013 from

a dealership in Pennsylvania, after purchasing it on the internet by putting a deposit on

the car almost a month before picking it up.  (<u>Id.</u> at 86-88.)  While driving eastbound on

Interstate 20, in Mississippi, Mr. Jamison passed a patrol vehicle on the right hand

shoulder of the road.  (<u>Id.</u> at 49.)  Immediately after passing the patrol vehicle, it pulled

out behind Mr. Jamison and followed him for approximately a minute before blue-

lighting him.  (Id. at 49-50.)  Mr. Jamison immediately pulled over to the right side of the Interstate.  (Jamison Dep. at 50.)

At the time of the stop, Mr. Jamison was not speeding and had his seatbelt on. (Id. at 51.)  The patrol vehicle stopped approximately two to three steps behind Mr. Jamison's car and the officer waited in his vehicle two or three minutes before approaching Mr. Jamison's passenger-side window.  (Id. at 52-53.)  The officer, the Defendant Nick McLendon, asked Mr. Jamison for his driver license, registration, and proof of insurance and Mr. Jamison complied by providing the requested documents. (Id. at 53-54.)  The Defendant McLendon then informed Mr. Jamison that he stopped him for not having a tag.  (McLendon Dep. at 37.)  Despite this statement, Mr. Jamison had a valid temporary tag issued by the State of Pennsylvania through the dealership which was properly displayed, *i.e.* bolted to the car.  (Jamison Dep. at 90-92; McLendon Dep. at 25, 35, 37.)

The Defendant McLendon believes or pretends to believe that a temporary tag is *per se* illegal to display in Mississippi and amounts to driving with no tag in Mississippi regardless of its proper display or validity.  (McLendon at 27-28, 65.)  When asked to provide the legal or statutory basis for his belief that an otherwise valid temporary tag is illegal to display in Mississippi, the Defendant McLendon references the "no tag" statute.  (Id.)

2

According to the Defendant McLendon, the sole reason that he stopped Mr.

Jamison was due to his temporary tag.  (Id. at 45.)  In his deposition, the Defendant

McLendon initially justified his stop of Mr. Jamison based on his allegation that Mr.

Jamison's tag could not be read by his computerized tag reading system and he couldn't

see the tag with his eyes.  (Id. at 28.)  The Defendant McLendon then backed away from

part of this justification when he acknowledged that the inability of his computerized

tag reading system to read Mr. Jamison's tag was not a cause for stopping Mr. Jamison

since even vehicles with reflective permanent tags cannot be read if the tags are dirty.

(Id. at 29.)  Ultimately, the only justification advanced by the Defendant McLendon for

stopping Mr. Jamison was his disputed allegation that Mr. Jamison's temporary tag was

folded over and he could not read the tag.  (Id. at 28, 31-32.)  This disputed factual

allegation by the Defendant McLendon is refuted by Mr. Jamison's testimony that his

temporary tag was held firmly in place and could not fold over and the Defendant

McLendon's admission that the original cardboard temporary tag he looked at during

his deposition showed no signs of creasing consistent with having been folded over.

(Jamison Dep. at 90-92; McLendon Dep. at 32-33.)[1]

---

[1]In his defense, the Defendant McLendon suggested that any crease in the
cardboard temporary tag could have been "ironed out."  (McLendon Dep. at 33-34.)

Q. Okay. For purposes of your testimony, you agree there's nothing to
indicate a crease was ever in that tag and the only suggestion you could
offer me is that maybe somebody ironed it?

While walking to Mr. Jamison's passenger side window ostensibly to initiate contact and speak with him regarding the temporary tag, the Defendant McLendon could see that the temporary tag on Mr. Jamison's car was not expired.  (Id. at 35.)

Q. Was the tag in date?

A. I don't remember but I assume from what's been said here.

Q. Okay. It's written on the tag --

A. Yes, sir.

Q. -- if you'll believe me. And it's also been documented that the tag at that time was not expired.

MR. BUTLER: Object to the form.

BY MR. FLEITAS:

Q. Is that --

A. The only thing I can tell you is the night I stopped him and it was folded or I couldn't visibly see the tag.

Q. Understood. And you agree with me that the tag you're looking at today which was the tag that was on the car that night doesn't have any folds on it?

A. Yes.

Q. Okay. But the reason you stopped him was because the tag was folded over to where you couldn't see it?

A. Yes, sir.

(Id.)

4

A. Yes, sir.

Q. Okay. So did you realize that when you went up to talk to Mr. Jamison?

A. Yes, sir.

Q. Okay. Because I'm assuming if the real reason you stopped him was the tag and you were only stopping him because you wanted to make sure that he was driving with a valid tag, by the time you got up to him you'd already seen that the tag was in date. Correct?

A. Yes, sir. But it can't be verified on NCIC.  You've got to run the VIN number.

(Id.)

After getting Mr. Jamison's driver license, bill of sale, and proof of insurance, the Defendant McLendon returned to his patrol vehicle where he remained for approximately 10-15 minutes.  (Jamison Dep. at 54-55.)  During that time he examined Mr. Jamison's driver license, and paperwork, and conducted a computerized check on Mr. Jamison's information.  (McLendon Dep. at 38-39.)  The computerized database check performed by the Defendant McLendon showed that Mr. Jamison was clear.  (Id.) The Defendant McLendon then contacted dispatch and requested a NCIC check on Mr. Jamison and the VIN for the car.  (Id. at 39-40.)[2]

_____

[2]According to the Defendant McLendon he received verification from dispatch that Mr. Jamison's driver license and car were clear within approximately 5-10 minutes of requesting the information while initiating a consent search of Mr. Jamison's car. (McLendon Dep. at 47-48.)  Mr. Jamison's deposition testimony contradicts this assertion since he testified that the Defendant McLendon took 10-15 minutes in his

While allegedly awaiting the information he requested from dispatch, the

Defendant McLendon returned to Mr. Jamison's car for the purpose of finding a reason

to search the car or get Mr. Jamison's consent to search the car. (Id. at 44.)

> Q. Great. Now, you go and you engage him in conversation which you engaged him in as part of your training as an interdiction officer?
>
> A. Yes, sir.
>
> Q. Your purpose when you left his vehicle was to try to get him to consent to let you search the vehicle?
>
> A. Depending on what he told me and any other indicators I might have received from him.
>
> Q. That was your goal?
>
> A. Goal? What?
>
> Q. To get a search of his vehicle.
>
> A. Yes, sir.
>
> Q. When you got out of your vehicle to engage him, your goal was I want to search his vehicle?
>
> A. Yes, sir.
>
> Q. And everything that you did in your interactions with him was focused

---

patrol vehicle before returning to his car and handing him back his driver license. (Jamison Dep. at 54-55.) Crediting Mr. Jamison's testimony means that the Defendant McLendon knew that Mr. Jamison's record was clean and the ostensible reason for stopping and detaining him was resolved, before returning to Mr. Jamison's car and purposely prolonging the stop in order to engage in a snipe-hunt for non-existent narcotics.

on that purpose. That was your mission?

A. I wouldn't say mission. Wait on his license to come back.

Q. Okay. Now, at the point that you went back to talk to him, you had no evidence of any illegality. Correct?

A. No, sir.

Q. And the only reason you'd stopped him was because of this tag issue.

A. Yes, sir.

(Id. at 44-45.)  The Defendant Mclendon had the choice to wait in his patrol vehicle for the information from dispatch but purposefully left his vehicle to engage in a captive audience conversation with Mr. Jamison in an effort to search his car as part of his (drug) interdiction mission.  (McLendon Dep. at 42-43.)

As already noted, Mr. Jamison waited in his car for 10-15 minutes, before the Defendant McLendon returned with his driver license, bill of sale, and insurance information.  (Jamison Dep. at 55.)  When the Defendant McLendon handed back Mr. Jamison's documentation, he made no mention of any irregularity with respect to his driver license, or vehicle, or the need to await additional information from dispatch. (Id. at 63.)  The Defendant McLendon asked Mr. Jamison for consent to search his car. (Id. at 56, 62.)  Mr. Jamison refused consent and the Defendant McLendon changed the subject to start talking about Mr. Jamison's work as a welder.  (Id. at 57.)

After making small-talk geared towards establishing a rapport with Mr. Jamison

7

and securing consent or some reason to justify a search, the Defendant McLendon asked

Mr. Jamison for consent again.[3]  (Jamison Dep. at 58; McLendon Dep. at 42.)  Again, Mr.

Jamison refused consent and the Defendant McLendon then told Mr. Jamison that he

had received an anonymous tip that there were ten kilograms of cocaine in his car.

(Jamison Dep. at 58, 63-64.)  The Defendant McLendon was rude in making the

allegation regarding the ten kilograms of cocaine in Mr. Jamison's car and generally

about his insistence in wanting to search Mr. Jamison's car.  (Id. at 63.)  When Mr.

Jamison asked why the Defendant McLendon insisted in wanting to search his car, the

Defendant McLendon repeatedly made reference to there being ten kilograms of

cocaine in Mr. Jamison's car.  (Id. at 63-64.)

Despite telling the Defendant McLendon several times that there were no drugs

in his car, the Defendant McLendon persisted in asking Mr. Jamison for consent to

search while keeping his arm inside of Mr. Jamison's car thus preventing him from

going on his way.  (Id. at 59-60.)  In addition to telling Mr. Jamison that he had received

an anonymous call regarding there being ten kilograms of cocaine in his car, the

Defendant McLendon told Mr. Jamison that his license was suspended, that his car was

---

[3]Though not relevant for summary judgment purposes, the Defendant
McLendon denies repeatedly asking Mr. Jamison for consent to search while keeping
his arm inside of Mr. Jamison's car to keep him from driving away.  (McLendon Dep. at
47.)  According to the Defendant McLendon he simply asked Mr. Jamison for consent to
search one or two times and Mr. Jamison gave him consent to search.  (Id. at 46-47, 71.)

stolen, and that he did not have insurance.  (Id. at 83-85.)  The Defendant McLendon

also attempted to encourage Mr. Jamison to consent to a search by saying that he would

not arrest him if he only found a small amount of drugs in the car.[4]  (McLendon Dep. at

78.)  The Defendant McLendon also told Mr. Jamison that when he had a hunch there

---

[4]The Defendant McLendon's candid testimony about securing "consent" in this manner is noteworthy:

Q. Back on the record after a short break. Did you ever make a remark to Mr. Jamison about a roach?

A. Probably.

Q. All right. Why do you say probably?

A. *Because sometimes if people -- you know, they can get kind of hesitant on giving consent because they got a dime bag of marijuana in the car or a roach in the ashtray, and I always tell the people hey, if you've just got a small amount of marijuana you give it up, you go on about your road, I pull the case, I destroy it just to kind of alleviate wasting ti[m]e.*

Q. Did you ever make any statement to him to the effect of look, man if you've got a little roach or something like that I'm not worried about that. I'm just going to throw that away?

A. Possibly.

Q. All right. That's not a truthful statement, is it?

A. Sometimes. *If it's just a little roach, I make them play soccer on the side of the road with it, kick it in the dirt. Sometimes if it's a bag I pull a case and destroy it.*

(McLendon Dep. at 78-79 (emphasis added).)

were drugs in a car, he was right 90% of the time.  (Id. at 77.)

After asking Mr. Jamison four or five times for consent to search his car, Mr.

Jamison finally relented given that the Defendant McLendon kept his arm in his car and

refused to allow Mr. Jamison to go on his way without permitting him to search.

(Jamison Dep. at 61; Jamison Statement at 33-35.)

Mr. Jamison, concerned that drugs might be planted in his car, requested that

any search of his vehicle be conditioned on being able to see the Defendant McLendon

conduct the search.  (Jamison Dep. at 61.)  At this point, the Defendant McLendon came

around to the driver side of Mr. Jamison's car, asked him to step out of the car and

patted him down, before instructing him to stand in from of his patrol vehicle.  (Jamison

Dep. at 64-66; McLendon Dep. at 49-50.)  The Defendant McLendon's search of Mr.

Jamison was extremely thorough and time consuming.  (Jamison Dep. at 67.)  At one

point during the search, Mr. Jamison complained that he could not see what the

Defendant McLendon was doing and sought to withdraw his consent to search.  (Id. at

69-70.)  The Defendant McLendon told Mr. Jamison that he could not withdraw his

consent once given and continued searching Mr. Jamison's car.[5]  (Id.)

In conducting his search of Mr. Jamison's car, the Defendant McLendon caused

---

[5]According to the Defendant McLendon, Mr. Jamison did not talk to him about
withdrawing his consent to search.  (McLendon Dep. at 50.)  The Defendant McLendon
admitted that Mr. Jamison was not free to leave the stop unless he withdrew his consent
to search.  (Id.)

damage to a driver side vent, the seats, and the convertible top (Id. at 75-76.)  After the

search, the Defendant McLendon handed Mr. Jamison a small flashlight and told him to

look over his car in the dark for damage and that he would pay for any damage to his

car.  (Id. at 78-79.)  A tired Mr. Jamison looked for approximately a minute before telling

the Defendant McLendon that he could not see any damage to his car.  (Jamison Dep. at

78-79.)  The Defendant McLendon then issued Mr. Jamison a "Courtesy Warning" for

driving with "no tag."  (Jamison Dep. at 97-98; McLendon Dep. 64-65.)  In all, Mr.

Jamison felt as though he had been detained on the side of the road for approximately

three-and-a-half hours.  (Jamison Dep. at 80.)  According to the Defendant McLendon,

he detained Mr. Jamison for one hour and fifty minutes.  (McLendon Dep. at 26.)

Despite having a K-9 officer in his patrol vehicle the entire time, the Defendant

McLendon did not ask Mr. Jamison for permission to use the K-9 until the end of his

search and the encounter.  (Jamison Dep. at 70; McLendon Dep. at 57-58.)  The K-9 did

not alert to the presence of drugs in Mr. Jamison's car.  (McLendon Dep. at 57-58.)

　　　The Defendant McLendon admitted that the only reason he stopped Mr. Jamison

was because he viewed his temporary tag as amounting to driving with no tag and/or

because he could not read the temporary tag because it was folded over.  (Id. at 44-45,

65.)  Mr. Jamison had committed no other infraction which would have justified

stopping him.  (Id.)  Once he stopped Mr. Jamison and approached his car, the

Defendant McLendon could see that Mr. Jamison's car had a properly mounted and in date temporary tag issued by Pennsylvania.  (Id. at 34-35.)  Mr. Jamison's driver license was valid; his bill of sale and other documentation proved his lawful ownership of the car; and he had proof of insurance for the car.  (Id. at 36, 69.)

From the start of his encounter with Mr. Jamison, the Defendant McLendon's sole goal was to conduct a search of Mr. Jamison's car for narcotics.  (McLendon Dep. at 44-46.) Ultimately, the Defendant McLendon's lack of an objective basis to stop Mr. Jamison's car and his admitted absence of articulable suspicion or probable cause to search the car condemn his claim to an entitlement to be summarily dismissed from this civil action:

> Q. All right. Now, what probable cause did you have to stop Mr. Jamison?
>
> A. I had reasonable suspicion, no tag.
>
> Q. Tell me what probable cause you had or what -- tell me what articulable [sic] suspicion you had at the time you requested consent.
>
> A. I didn't need any, but the recently purchased vehicle, traveling all the way across the country, coming from Phoenix, Arizona, a source area, and headed back to South Carolina.
>
> Q. And for those reasons you believe that you didn't even need his consent?
>
> A. Yes. If I didn't need his consent I would have just searched it.
>
> Q. Did you need his consent?

A. That or probable cause.

Q. You didn't have probable cause.

A. Not at that time.

Q. And you didn't get probable cause?

A. No, sir.

Q. All right. So the only lawful basis that there would have been for the search of the vehicle that you agree with me is the allegation. There's the question of consent.

MR. BUTLER: Object to the form. You can answer.

BY MR. FLEITAS:

Q. Outside of the consent there was no basis for you searching Mr. Jamison's vehicle. Correct?

MR. BUTLER: Object to the form.

A. I don't understand the question.

BY MR. FLEITAS:

Q. If he had said I'm not giving you consent --

A. I would have ran my police department canine.

Q. All right. And it would have shown nothing.

A. Possibly.

Q. Well, it didn't.

A. Yes.

Q. I mean, you ran it. It showed nothing.

A. Yes, that's true.

Q. So you would have run the canine. At that point he would have been there -- what? -- 10, 15 minutes?

A. Maybe.

Q. You would have run the canine. Right?

A. Yes, sir.

Q. First?

A. Yes, sir. If he would have refused consent.

Q. And it wouldn't have indicated?

A. No, sir.

Q. Because that process can never be manipulated. Right?

A. It can be.

Q. It sure can.

A. Mine is not.

Q. I understand.

A. Not on a Mercedes.

Q. I'm just saying. So you would have run the dog. The dog would have shown nothing and --

A. He'd have been free to go.

Q. He'd have been free to go. So you agree with me there was no probable cause to search Mr. Jamison's vehicle?

MR. BUTLER: Object to the form.

BY MR. FLEITAS:

Q. The search was solely lawful based on consent?

MR. BUTLER: Same objection.

A. Correct.

BY MR. FLEITAS:

Q. All right. Absent consent if he had just said no, no, no, no, no. Okay, well, I'm going to run my dog. You run your dog. The dog doesn't indicate.

A. He's free to go.

Q. All right. I'm just trying to make sure what the issues are in the case. I'm not trying to be difficult.

A. That's fine.

Q. And I understand we have a fundamental disagreement about what you gentlemen said to one another on the side of the road. That's why we're here. Having said that, though, I just want to make sure that there's not some other basis other than consent that you would be alleging justified you to search that vehicle. So outside of the consent no search. Correct?

MR. BUTLER: Object to the form.

A. Correct.

(Id. at 56-59.)

II.     SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A factual " issue is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the non-moving party," and "'material' if its resolution could affect the outcome of the action." Burrell v. Dr. Pepper/Seven Up Bottling Grp., Inc., 482 F.3d 408, 411 (5th Cir. 2007).  In reviewing a summary judgment, all facts and inferences must be construed in the light most favorable to the non-moving party.  Burrell, 482 F.3d at 411.

The party seeking summary judgment carries the burden of demonstrating that there is no evidence to support the nonmovant's case. " Hirras v. National R.R. Passenger Corp., 95 F.3d 396, 399 (5th Cir. 1996) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)).  In ruling on a motion for summary judgment, the court is not to make credibility determinations, weigh evidence, or draw from the facts legitimate inferences for the movant.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  Rather, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.  Anderson, 477 U.S. at 255.

III.    QUALIFIED IMMUNITY STANDARD

The doctrine of qualified immunity protects public officials acting within the

scope of their official duties from civil liability so long "as their conduct does not violate

clearly established statutory or constitutional rights of which a reasonable person would

have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  In order to overcome the

Defendant McLendon's assertion of qualified immunity in this case, Mr. Jamison must

establish (1) that he has asserted the violation of a constitutional right; (2) that was

clearly established at the time of the Defendant McLendon's actions; and (3) that the

Defendant McLendon's actions were objectively unreasonable.  Eugene v. Alief Indep.

Sch. Dist., 65 F.3d 1299, 1305 (5th Cir. 1995) (citing Siegert v. Gilley, 500 U.S. 226, 232

(1992)).  Where factual disputes exist regarding the assertion of qualified immunity

during summary judgment, the Mr. Jamison's version of the facts is accepted as true.

Kinney v. Weaver, 367 F.3d 337, 348 (5th Cir. 2004).

IV.    ARGUMENT & AUTHORITIES

        The Defendant McLendon asserts that he is entitled to summary judgment with

respect to Mr. Jamison's Fourth Amendment and Fourteenth Amendment claims based

on the absence of any genuine issues of material fact and based on qualified immunity.

Stated succinctly, the Defendant McLendon's claim to any such an entitlement fails.

        Factually and legally, two disputed questions of fact preclude summary

judgment.  First, though there is no dispute that the sole reason the Defendant

McLendon stopped Mr. Jamison, in the first place, had to do with his temporary tag, it

17

is disputed whether or not the Defendant McLendon's claim that he could not see Mr. Jamison's tag, thus justifying his stop, is truthful.  Second, though there is no dispute that the Defendant McLendon conducted a search of Mr. Jamison's and detained him for at least one hour and fifty minutes, it is entirely disputed whether or not the Defendant McLendon unlawfully extended the traffic stop, and unlawfully detained Mr. Jamison in order to coerce him into giving permission to search his car.

The resolution of these disputed factual issues, in light of the clearly established law, augers that this civil action must ultimately be resolved by the trier of fact and not by summary disposition.

A.     The Defendant McLendon's Initial Stop of Mr. Jamison Violated the Fourth Amendment.

In his brief, the Defendant McLendon says that he initially blue-lighted Mr. Jamison because his tag recognition system could not read Mr. Jamison's temporary tag and because he could not confirm its validity.  With respect to the failure of his tag recognition system to read Mr. Jamison's tag, the Defendant McLendon admitted that this did not justify his stopping Mr. Jamison.  (McLendon Dep. at 29-30.)  With respect to not being able to confirm the validity of the tag, what the Defendant McLendon actually said in his deposition was that the tag was folded over and he could not read it.  (Id. at 31-33.)  Another reason given by the Defendant McLendon for stopping Mr. Jamison, but tellingly not mentioned in his brief, was his mistaken belief that driving

18

with a temporary tag in Mississippi was *per se* illegal and amounted to a violation of the "no tag" statute.  (Id. at 37-38, 56.)

Summary judgment cannot be granted based on the Defendant McLendon's disputed allegation that Mr. Jamison's temporary tag could not be read because it was folded over.  Granted, if this allegation were true, the Defendant McLendon, would have had a legitimate reason to stop Mr. Jamison, until he could ascertain the validity of the temporary tag.  See Miss. Code Ann. § 27-19-323.  Regrettably for the Defendant McLendon, this factual assertion is hotly disputed and provably false.  First, Mr. Jamison testified that his temporary tag was properly affixed to the rear of his car with bolts to prevent it from folding over and to ensure it could be read.  (Jamison Dep. at 90-92.)  Making matters worse for the Defendant McLendon, when he was shown the temporary tag at his deposition he had to admit that the tag showed no signs of ever having been folded over.  (McLendon Dep. at 32-34.) Simply stated, either the temporary tag was folded over to where the Defendant McLendon could not read it, in which case he was justified in stopping Mr. Jamison, or the Defendant McLendon is intentionally fabricating the allegation of an unreadable tag as a way to justify the stop and fend off this litigation.  Either way, only the jury can decide which is which.

There exists one other possibility regarding the Defendant McLendon's stop of Mr. Jamison.  The Defendant McLendon could have stopped Mr. Jamison because he

either believed that driving with a temporary tag is illegal in Mississippi or pretending to believe it was.  Several facts support this as the actual reason that the Defendant McLendon stopped Mr. Jamison.  First, the Defendant McLendon told Mr. Jamison he stopped him for driving with "no tag."  Second, the courtesy warning given to Mr. Jamison by the Defendant McLendon stated the warning was for, "no tag."

The Defendant McLendon's cited authorities in support of the proposition that he could stop Mr. Jamison solely for displaying a temporary tag do not, in fact, support that proposition.  The use of a temporary tag in Mississippi is unquestioningly and perfectly legal so long as it is properly displayed and readable.  See Miss. Code Ann. § 27-19-40©.  The authorities cited by the Defendant McLendon upheld stops only where the temporary tags, valid in themselves, were improperly displayed or unreadable.  See Twenty Thousand Eight Hundred Dollars ($20,800.00) in U.S. Currency v. Mississippi Bureau of Narcotics, 115 So. 3d 137, 140 (Miss. App. 2013) (faded and partially obscured temporary tag with dating system unreadable from a distance justified stop);  Wade v. Mississippi, 33 So. 3d 498, 504-05 (Miss. App. 2009) (improperly displayed and unreadable tag justified stop); Gonzalez v. Mississippi, 963 So. 2d 1138, 1143 (Miss. 2007) (same).  None of these facts justifying the stops in the cases cited by the Defendant McLendon are present in this case and the Defendant McLendon made no allegation that Mr. Jamison's temporary tag could not be read, only that he could not read it

20

because it was folded up.

What the Defendant Mclendon does allege justified his stop of Mr. Jamison was the "fact" that a car with a temporary tag was in violation of the law in Mississippi. The Defendant McLendon stated several times that he was fully justified in stopping Mr. Jamison based solely on the temporary tag. This fundamental mistake of law by the Defendant McLendon invalidates his stop of Mr. Jamison.

The law in the Fifth Circuit has been clearly established for decades that an officer's mistake of law regarding the reason for initiating a traffic stop does not justify the stop and violates the Fourth Amendment. See United States v. Miller, 146 F.3d 274, 278-79 (5th Cir. 1998) (stating where statute did not prohibit the alleged actions of defendant, no justification for stop); United States v. Lopez-Valdez, 178 F.3d 282, 288 C(5th Cir. 1999) (holding where statute did not prohibit driving with cracked taillight, officer could not have an objectively good faith belief that he had cause for stop). Here, the Defendant McLendon's wrong-headed belief that driving along an interstate in Mississippi with a temporary tag authorizes a stop violated Mr. Jamison's right to be free from an unlawful stop.

The disputed issues of fact regarding the actual reason why the Defendant McLendon stopped Mr. Jamison and the actual condition of the temporary tag at the time of the stop preclude the summary disposition of Mr. Jamison's Fourth Amendment

21

claim for being illegally stopped.

B.     The Defendant McLendon's illegal search of Mr. Jamison's car and his prolonged detention of Mr. Jamison violated the Fourth Amendment.

The Defendant McLendon asserts that his search of Mr. Jamison's car and his prolonged detention of Mr. Jamison, lasting a minimum of almost two hours, pass constitutional muster.  Contrary to the Defendant McLendon's assertion, the disputed material facts regarding the circumstances under which he conducted the search and prolonged Mr. Jamison's detention provide a textbook example of abuse of authority.

As already noted, once the Defendant McLendon stopped Mr. Jamison, he asked for and received Mr. Jamison's driver license, proof of ownership, and proof of insurance.  (Jamison Dep. at 54.)  According to Mr. Jamison, the Defendant McLendon then took these items to his patrol vehicle and remained there for approximately 10-15 minutes.  (Id. at 55.)  Upon returning to the passenger side of Mr. Jamison's car, the Defendant McLendon returned the items that Mr. Jamison had handed him previously and Mr. Jamison believed he had completed the check on his driver license.  (Jamison Statement at 5-7, 13-14.)  As Mr. Jamison was preparing to go, the Defendant McLendon put his arm inside of Mr.. Jamison's car and prevented him from resuming his travel while telling Mr. Jamison to, "hold on!" and that he received a call saying that there were ten kilograms of cocaine in the car.  (Id. at 6.)  It was then that the Defendant McLendon made clear to Mr. Jamison through word and deed that he would not be

permitted to leave until he gave "consent" to search his car.  (Id. at 7.)

It is axiomatic that,  "[o]nce the purpose of a  valid traffic stop has been completed and an officer's initial suspicions have been verified or dispelled, the detention must end unless there is additional reasonable suspicion supported by articulable facts."  United States v. Estrada, 459 F.3d 627, 631 (5th Cir. 2006).  Also, an investigative traffic detention "may last no longer than required to effect the purpose of the stop."  United States v. Jenson, 462 F.3d 399, 404 (5th Cir. 2006).  Here, competent summary judgment evidence supports the conclusion that the Defendant McLendon prolonged Mr. Jamison's detention, after the illegal stop, by physically preventing Mr. Jamison from resuming his travel after the initial alleged reason for the stop, some issue with his temporary tag, was resolved.

The Defendant McLendon attempts to independently bolster his prolonged detention of Mr. Jamison and his illegal search by focusing on several entirely innocent facts: (1) Mr. Jamison drove from Phoenix, Arizona, a "known drug location;"[6] (2) Mr. Jamison drove on Interstate 20, a "known drug route;"[7] Mr. Jamison drove a car he

---

[6]Narcotic drugs in the United States are ubiquitous.  Is any place in this Nation, urban or rural, not a known drug location or not subject to being referred to as such?

[7]Other "known drug routes" include every Interstate in the United States.  See https://www.justice.gov/archive/ndic/pubs11/18862/transport.htm.  According to the National Drug Threat Assessment 2006, by the National Drug Intelligence Center, "[v]irtually every interstate and highway in the United States is used by traffickers to transport illicit drugs to and from distribution centers and market areas throughout the

purchased in Pennsylvania only thirteen days before being stopped with money he

lawfully earned and obtained; Mr. Jamison was in possession of a valid driver license

issued by the State in which he resided; and Mr. Jamison had a valid temporary tag

issued by the State where he had purchased his car.  As this Court noted in United

States v. Alvarado, No. 3:12CR113-CWR-FKB at 8 (S.D. Miss. Oct. 2, 2013), "[s]uspicions

clearly based on lawful conduct, or at least conduct in which law-abiding citizens are

just as likely to be engaged, are not reasonable."  United States v. Lopez, 817 F. Supp.

2d 918, 926n.57 (S.D. Miss. 2011) (citing United States v. Rangel-Portillo, 586 F.3d 376,

381 (5th Cir. 2009)).

The Defendant McLendon's suggestion that Mr. Jamison freely and voluntarily

consented to the search of his car lacks arguable merit on this record.  Consent is a

recognized exception to the Fourth Amendment requirement that a search be supported

by a warrant or probable cause.  United States v. Scroggins, 599 F.3d 433, 440 (5th Cir.

2010).  The Defendant McLendon has the burden of proving that the consent was

voluntary.  United States v. Arias-Robles, 477 F.3d 245, 248 (5th Cir. 2007).  In

considering the voluntariness of the consent, a court should consider the following

relevant factors: (1) the voluntariness of the defendant's custodial status; (2) the

presence of coercive police procedures; (3) the extent and level of the defendant's

---

country, and every highway intersection provides alternative routes to drug markets."
Id.  Interstate 20 through Mississippi did not crack the top eight.  Id.

cooperation with the police; (4) the defendant's awareness of his right to refuse consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found.  Arias-Robles, 477 F.3d 248.

First, the Defendant McLendon admitted that Mr. Jamison's interactions with him were neither voluntary nor consensual as he was never free to leave at any time until after the search was conducted.  Second, Mr. Jamison was physically kept from resuming his travel home, after having his driver license and other documents returned to him, when the Defendant McLendon placed his arm inside his car and badgered him for consent.  Third, though Mr. Jamison cooperated with the Defendant McLendon's requests, their exchanges became heated, as the Defendant McLendon repeatedly leveled false allegations and encroached on Mr. Jamison's liberty.  Fourth, though aware of his right to refuse consent, Mr. Jamison was aware that without relenting to the Defendant McLendon's repeated demands for consent, he might never get back home.[8]  Fifth, Mr. Jamison has a high school education, is intelligent, and works as a

---

[8]In his brief, the Defendant McLendon makes gratuitous references to Mr. Jamison's driver license being suspended previously and his refusing a breathalyser on two prior occasions.  These gratuitous statements are meant solely to make Mr. Jamison look bad in the Court's eyes.  The truth is that Mr. Jamison has never been convicted of any alcohol-related driving offense.  Further, the suspensions of his driver license were due to unpaid property tax (due to his prolonged absence from South Carolina due to work), from May 18, 2016 until June 9, 2016, and due to an administrative suspension pursuant to South Carolina's implied consent law from March 27, 2010 until June 24, 2010.

skilled tradesman.  Sixth, Mr. Jamison knew to a certainty that no drugs would be found in his car unless law enforcement planted them.

Taking all of these factors together, in light of the disputed facts, a genuine issue of material fact exists regarding the voluntariness of Mr. Jamison's consent to search. When this factually disputed question of voluntariness is considered in light of a detention which lasted for a minimum of almost two hours, a summary disposition of this civil action in favor of the Defendant McLendon is not justified.  See Alvarado, No. 3:12CR113-CWR-FKB at 26 n.21 ("For an entire hour, he stood along the side of the highway for reasons not tied to reasonable suspicion that he had committed a crime or was engaged in the commission of a crime.  This is unacceptable.")

C.     A genuine issue of material fact exists regarding the Defendant McLendon's race-based motive for stopping and detaining Mr. Jamison in violation of the Fourteenth Amendment.

The Defendant McLendon asserts that he is entitled to summary judgment with respect to Mr. Jamison's Fourteenth Amendment Equal Protection claim for racial discrimination.  Given evidence that the Defendant McLendon was aware of Mr. Jamison's race before he stopped him and the Defendant McLendon's pretextual assertions for why he stopped Mr. Jamison, a reasonable inference can be drawn that Mr. Jamison's race was a motivating factor in the stop.

Prior to stopping Mr. Jamison, the Defendant McLendon was aware of his race

because the two of them had made eye contact as Mr. Jamison drove past him on Interstate 20.  (Jamison Dep. at 107-08.)  The Defendant McLendon immediately pulled in behind Mr. Jamison and quickly blue-lighted him.  (Id. at 50.)  Mr. Jamison was neither speeding nor breaking any other traffic laws at the time that the Defendant McLendon stopped him.  (Id. at 83-84.)  Further, the Defendant McLendon fabricated the reason for the stop by claiming the tag could not be read and launched into a series of false allegations towards Mr. Jamison regarding cocaine, a suspended driver license, a stolen car, and no insurance.  (Id. at 83-85.)

In order to establish a violation of Equal Protection based on race-based animus, Mr. Jamison must show that his race was a motivating factor in the Defendant McLendon's decision to stop him.  See Wallace v. Texas Tech, Univ., 80 F.3d 1042, 1047 (5th Cir. 1996) (§ 1983 Equal Protection employment discrimination case applying Title VII evidentiary framework).  As in any other case, Mr. Jamison may prove his case through direct or circumstantial evidence.  In the absence of direct evidence of discriminatory intent, Mr. Jamison could rely on circumstantial evidence to support his race discrimination claim.  Circumstantial evidence of discrimination can be proven where the trier of fact finds that a defendant's stated reason for taking an action is not true, but is instead a pretext for discrimination or that a defendants' reason, while true, is only one of the reasons for its conduct and another motivating factor is race.  Rachid

v. Jack In The Box, Inc., 376 F.3d 305, 312 (5th Cir. 2004).

The Defendant McLendon claims that Mr. Jamison's race had nothing to do with the traffic stop.  However, accepting Mr. Jamison's testimony as true, a reasonable juror could conclude that the Defendant McLendon had absolutely no reason to stop Mr. Jamison in the absence of any arguable traffic offense.  Such a finding by the trier of fact would permit the inference the Defendant McLendon's stated reason(s) for stopping Mr. Jamison constitutes a pretext masking discriminatory intent.

Summary judgment with respect to Mr. Jamison's Fourteenth Amendment claim would be inappropriate in light of the permissible inferences of discriminatory intent which can be drawn from the Defendant McLendon's unjustified stop of Mr. Jamison.

D.    The Defendant McLendon is not entitled to qualified immunity.

The Defendant McLendon contends that even in the face of a constitutional violation he is entitled to qualified immunity because no guiding precedents would have made him aware that his actions were unlawful.  This argument fails based solely on the cited precedents in this memorandum which specify the unlawfulness of the Defendant McLendon's actions towards Mr. Jamison and the unresolvable factual dispute which precludes summary disposition of Mr. Jamison's claim through qualified immunity.

This case presents two distinct factual disputes: (1) whether Mr. Jamison

committed a vehicle tag violation justifying a traffic stop; and (2) whether or not the

Defendant McLendon's search of his car was voluntary or coerced.  Mr. Jamison's

testimony unequivocally establishes that he neither committed a traffic violation nor

voluntarily gave consent to search.  The Defendant McLendon's testimony is entirely to

the opposite.  "The jury's role has not been entirely abolished in qualified immunity

cases."  Jordan v. Wayne County, No. 2:16CV70-KS-MTP at 4 (S.D. Miss. May 17, 2017)

(citing Lampkin v. City of Nacogdoches, 7 F.3d 430, 435 (5th Cir. 1993)).  "'Rule 56 still

has vitality in qualified immunity cases if the underlying historical facts in dispute . . .

are material to the resolution of the questions whether the defendants acted in an

objectively reasonable manner in view of the existing law and facts available to them.'"

Jordan, No. 2:16CV70-KS-MTP at 4 (quoting Lampkin, 7 F.d3 at 435).  Where material

facts are in dispute a finding of objective reasonableness is not appropriate on summary

judgment.  Id. (citations omitted).

Accepting Mr. Jamison's account of the facts as true, the Defendant McLendon's

acts were not objectively reasonable.  The resolution of the disputed facts necessary to a

determination of objective reasonableness can only be undertaken by the trier of fact.

The Defendant McLendon is not entitled to summary judgment based on qualified

immunity.

V.      CONCLUSION

For the reasons stated above and premised on the existence of genuine issues of

material fact, Mr. Jamison requests that the Court deny the Defendant McLendon's

Motion [Doc. 46] for Summary Judgment.

Respectfully submitted, this the 16th day of January, 2018.

/s/ Victor Israel Fleitas

_____

          VICTOR I. FLEITAS
          MS BAR NO. 10259

Victor I. Fleitas, P.A.
452 North Spring Street
Tupelo, Mississippi 38804
(662) 840-0270 / Telephone
(662) 840-1047 / Facsimile
fleitasv@bellsouth.net / Email

Attorney for Clarence Jamison

CERTIFICATE OF SERVICE

I hereby certify that on January 16, 2018 I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to the following:

Gregory Todd Butler, Esq.
Phelps Dunbar
4270 I-55 North
Jackson, Mississippi 39211-6391
butlert@phelps.com

This the 16th day of January, 2018.

/s/ Victor Israel Fleitas

_____
VICTOR I. FLEITAS