**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

| | |
|---|---|
| **CLARENCE JAMISON** | **PLAINTIFF** |
| **VS.** | **CIVIL ACTION NO. 3:16-CV-00595-CWR-LRA** |
| **NICK MCLENDON** | **DEFENDANT** |

## ORDER

Before the Court is the Motion for Summary Judgment filed by the remaining defendant in this action, Officer Nick McLendon. Plaintiff Clarence Jamison, Jr. filed suit against McLendon and the Town of Pelahatchie alleging that McLendon conducted an unlawful traffic stop, unreasonably extended the stop, and unlawfully searched his vehicle, all in violation of the Fourth and Fourteenth Amendments. Having reviewed the briefs, evidence, and applicable law, McLendon's motion shall be granted in part and deferred in part.

**I.  Factual Background**

The facts are drawn from the parties' depositions.

On July 29, 2013, Jamison, an African-American male, was traveling home to Neeses, South Carolina. Jamison traveled on Interstate 20 East from a vacation in Phoenix, Arizona, driving a 2001 Mercedes-Benz CLK-Class Convertible he had recently purchased from a car dealer in Pennsylvania. While driving through the Town of Pelahatchie, Mississippi, Jamison passed the patrol car of McLendon, a white male, who was parked on the right shoulder of the Interstate. Shortly thereafter, McLendon stopped Jamison's vehicle.

McLendon asked to see Jamison's license and registration. Jamison complied and presented each document along with the vehicle's bill of sale. After receiving the documents, McLendon ran a background check on Jamison through the El Paso Intelligence Center

("EPIC"). The background check returned clear. McLendon then contacted the National Criminal Information Center ("NCIC") and asked the dispatcher to run a criminal history on Jamison as well as the VIN number on his vehicle.

When Jamison asked why he had been pulled over, McLendon responded that he could not read Jamison's license plate information on his automated License Plate Recognition ("LPR") system because Jamison's tag was folded over. Jamison later testified that his tag was fully readable because there were bolts attached to each of the four corners of the temporary license plate. When deposed for this case, McLendon examined the tag and admitted that there was no crease in it consistent with being folded. He claimed "it could have been ironed out."[1]

As McLendon waited on the results from NCIC, McLendon asked Jamison a series of questions, including questions about Jamison's occupation as a welder and the course of his travels. McLendon says he grew suspicious of Jamison's activity because Jamison was traveling from Phoenix, Arizona (and later stopped in Las Vegas, Nevada), a place McLendon considered "a known source area for narcotics."

---

[1] The following is an excerpt from McLendon's deposition:
- Q: When you got out of your vehicle, could you see his tag?
- A: Yes, sir. It was – when I walked up to it I could see it but it had a fold in it. Like, when you're driving down the road and the wind is coming behind the car, it lifts the tag up. When he stopped, it came back down.
- Q: And you would agree that the tag that he had is not a paper tag like I have papers in front of me right now or a thicker form of paper. It's actually a form of cardboard.
- A: Paper and cardboard? Yes, sir . . . .
- Q: Is it your testimony that this tag made out of cardboard could fold over without leaving a crease in it?
- A: Yes, sir.
- Q: I don't see a crease in this. Would you agree?
- A: Yes, sir.
- Q: Okay. Looking at the tag itself, you said it was folded up because wind, going 65 miles an hour folded it up obstructing your view. Correct?
- A: Yes, sir.
- Q: Is there a crease in that tag?
- A: Not that I can see.
- Q: All right. Can you think of any reason why in a cardboard tag if it had been folded up it wouldn't leave a crease?
- A: I mean, it's not like the night I seen it. I mean, it could have been ironed out [. . . .]

During this exchange, McLendon told Jamison he had received an anonymous tip that Jamison had 10 kilograms of cocaine in his trunk. McLendon denied ever making that statement, but did admit in his deposition that when he had a hunch about the presence of drugs, he was right about 90 percent of the time.

Jamison testified that McLendon asked to search the car four or five times. McLendon was so determined to obtain consent, Jamison says, that McLendon promised Jamison, if there was a "roach" of marijuana in the car, he would throw it on the side of the road, "pull the case[,] . . . and destroy it." Jamison did not believe he was free to leave because McLendon placed his arm in the window as he conducted the stop.

McLendon, in fact, admitted in his deposition that the goal of the stop was to obtain consent to search Jamison's car.

> Q: Your purpose when you left his vehicle was to try to get him to consent to let you search the vehicle?
> A: Depending on what he told me and any other indicators I might have received from him.
> Q: That was your goal?
> A: Goal? What?
> Q: To get a search of his vehicle.
> A: Yes, sir.
> Q: When you got out of your vehicle to engage him, your goal was I want to search his vehicle?
> A: Yes, sir.

After repeated requests, Jamison eventually consented to the search. Concerned that McLendon might plant drugs in his vehicle, however, Jamison stated that he would only consent if he could see McLendon in "plain sight." Jamison stood in front of McLendon's patrol car as McLendon conducted the search. Jamison testified that there were two other officers at the scene of the stop, but the other two officers did not participate in the search. McLendon allowed Jamison to "use the bathroom" on the side of the road three times.

McLendon did not find any drugs in Jamison's vehicle. Unsatisfied, though, McLendon then brought out his K-9—which had been waiting in McLendon's vehicle for over an hour at this point—to sniff around the car. The K-9 did not alert to the presence of drugs.[2]

After McLendon completed the search, he provided a flashlight to Jamison and asked him to inspect the car for damage. McLendon offered to pay for any property damage that may have resulted from the search. Jamison testified that he was tired from being stopped for so long, so he did not immediately notice the property damage he now claims resulted from the search. McLendon did not issue an official citation; instead he issued Jamison a "Courtesy Warning."

The clock on McLendon's dashboard camera indicated that the stop lasted one hour and 50 minutes. Jamison felt like it had been several hours.

On July 27, 2016, Jamison filed the instant lawsuit under 42 U.S.C. § 1983. Jamison sued McLendon in his individual capacity and the Town of Pelahatchie. The Town of Pelahatchie was dismissed from this suit on December 20, 2017. Jamison seeks actual and compensatory damages, as well as punitive damages and attorney's fees.

## II.     Summary Judgment Standard

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any" demonstrate that no genuine issue of any material fact exists and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). If the movant indicates a lack of evidence to survive summary judgment, "the non-movant must come forward with specific facts showing a genuine issue for trial." *Jones v. Lowndes County, Miss.*, 678 F.3d 344, 348 (5th Cir. 2012). The non-movant

---

[2] In McLendon's deposition, he was asked "Why didn't you start with the dog?" He replied, "Because dogs ain't 100 percent. Even though I got the best dog in the nation, contrary to popular belief they're not perfect."

4

cannot satisfy its burden by offering "conclusory allegations, speculation, or unsubstantiated assertions." *Ramsey v. Henderson*, 286 F.3d 264, 269 (5th Cir. 2002).

Courts are required to view all evidence in the light most favorable to the non-moving party and must refrain from making credibility determinations. *Strong v. Dep't of the Army*, 414 F. Supp. 2d 625, 628 (S.D. Miss. 2005).

## III. Discussion

Section 1983 affords relief to individuals who have been deprived of rights secured by the United States Constitution and other federal laws. 42 U.S.C. § 1983. To prevail in a § 1983 action, a plaintiff must prove that she was deprived of a right secured by federal law and that the defendant was acting under color of state law. *See Covington v. Kemp*, No. 4:10-CV-213-CWR-FKB, 2012 WL 2415188, at *3 (S.D. Miss. June 26, 2012) (citing *Martin v. Thomas*, 973 F.2d 449, 452-53 (5th Cir. 1992)).

Jamison argues that McLendon violated his Fourteenth Amendment right to equal protection by stopping him solely because of his race. In addition, Jamison contends that McLendon violated his Fourth Amendment right to be free from unreasonable searches and seizures by stopping his vehicle without reasonable suspicion, unlawfully extending the stop, and conducting a search of his vehicle without his voluntary consent.

Viewing the facts in the light most favorable to the non-movant, as the Court is required to do at this stage, the material facts are as follows:

- McLendon's automated LPR system did not read Jamison's license plate.
- Upon stopping Jamison, McLendon saw that Jamison's license plate was readable and not folded over.
- The background checks did not reveal any criminal history, outstanding fines, or warrants for Jamison.
- McLendon's goal was to search Jamison's vehicle.
- McLendon falsely claimed to have received an anonymous tip that Jamison had 10 kilograms of cocaine in the vehicle.

5

- In hopes of searching Jamison's vehicle, McLendon promised Jamison that if he found a roach of marijuana in the car, he would throw it to the side of the road.
- Jamison did not voluntarily consent to the search, but instead was coerced by McLendon's repeated requests and by McLendon placing his arm in Jamison's passenger window.
- McLendon's K-9 sat in the patrol car for over an hour before it was allowed to sniff around Jamison's vehicle. The K-9 did not alert to the presence of drugs.
- McLendon's encounter with Jamison lasted an hour and fifty minutes.

### A. Equal Protection

The Equal Protection Clause of the Fourteenth Amendment dictates that the government may not treat members of protected classes differently than similarly situated individuals. *See Whren v. United States*, 517 U.S. 806, 813 (1996) ("The Constitution prohibits selective enforcement of the law based on considerations such as race."). *Whren* is also significant as it stands for the proposition that the Equal Protection Clause may be violated even if police conduct does not violate the Fourth Amendment. *Id.*

The first prong of an equal protection claim requires proof that a member of protected class "received treatment different from that received by similarly situated individuals." *Taylor v. Johnson*, 257 F.3d 470, 473 (5th Cir. 2001). When addressing equal protection claims on the basis of race, courts have analyzed discriminatory effect based on whether a defendant provides unequal treatment to similarly-situated individuals of different races. *See Lawson v. Martinez*, No. SA-14-CA-164-XR HJB, 2015 WL 1966069, at *4 (W.D. Tex. Mar. 26, 2015), *report and recommendation adopted*, 2015 WL 1966122 (W.D. Tex. Apr. 27, 2015) (granting summary judgment on this claim).

Furthermore, a plaintiff must prove that the defendant's conduct was motivated by discriminatory intent. *See Taylor*, 257 F.3d at 473. "Discriminatory purpose . . . implies that the decision-maker singled out a particular group for disparate treatment and selected his course of

action at least in part for *the purpose* of causing its adverse effect on an identifiable group." *Id.* (citing *Lavernia v. Lynaugh*, 845 F.2d 493 (5th Cir. 1988)).

McLendon concedes that selectively targeting racial minorities in enforcing traffic laws has long been held to violate the Equal Protection Clause. Docket No. 58, at 1 (*citing Whren*, 517 U.S. at 813). He nevertheless claims that summary judgment is appropriate because Jamison failed to provide any statistical or tangible evidence that McLendon treated African-American motorists less favorably than individuals of other races. Docket No. 58, at 2 (*citing Starr v. Oklahoma*, 2007 WL 2874826, at *4 (N.D. Okl. 2007)).

Jamison alleges that McLendon conducted the traffic stop solely on the basis of Jamison's race, but cited a violation of Mississippi's "no tag" statute as a pre-textual justification to conduct the stop. To support this argument, Jamison testified that he and McLendon made eye contact as Jamison was driving, and McLendon was able to ascertain that Jamison is an African-American male.

District courts have routinely held that a plaintiff's offering of conclusory allegations of discriminatory treatment does not satisfy the requisite factual or legal standard to assert an equal protection claim. *See, e.g. Lawson*, 2015 WL 1966069, at *4; *McKnight v. Eason*, 227 F. App'x 356 at *1 (5th Cir. 2007). That is the case here. Jamison has offered nothing beyond a bare-bone assertion that McLendon violated his right to equal protection of the law, without identifying material facts in the record to support his position. *See Stout v. Vincent*, 717 F. App'x 468, 473 (5th Cir. 2018). Jamison's claim that he and McLendon made eye contact while driving, alone, is not evidence of discriminatory treatment.

Jamison may genuinely believe McLendon's purpose for the stop was pretext for racial discrimination, but Jamison has not offered tangible evidence of comparative discriminatory

7

treatment among similarly-situated individuals of different classes. A plaintiff's "subjective belief of discrimination, however genuine, [cannot] be the basis of judicial relief." *Elliot v. Grp. Med. & Surgical Serv.*, 714 F.2d 556, 567 (5th Cir. 1983). Without more, Jamison cannot avoid summary judgment on the issue of equal protection. No qualified immunity analysis need be conducted. *See McKee v. City of Rockwall, Tex.*, 877 F.2d 409, 416 (5th Cir. 1989) (granting summary judgment to a police officer in a § 1983 action because the non-movant failed to offer evidence "to support her equal protection claim, thus pretermitting a qualified immunity inquiry").

### B. *Terry Stop*

The Supreme Court's decision in *Terry v. Ohio* provides the standard for reasonable suspicion during investigatory traffic stops. 392 U.S. 1 (1968). The *Terry* Court established that limited traffic stops are justified only when the police have reasonable suspicion, supported by articulable facts, that a crime is occurring or has occurred. In the course of a valid traffic stop, an officer may request a driver's license, ask questions related to the stop, and run any necessary computer checks to dispel or confirm the officer's reasonable suspicion. Courts are to assess reasonableness based on the totality of the circumstances. *United States v. Estrada*, 459 F.3d 627, 631 (5th Cir. 2006).

McLendon argues that he initiated the traffic stop because he observed what he perceived to be a violation of Mississippi Code § 27-19-323, which he referred to as Mississippi's "no tag" statute. More specifically, McLendon claims Jamison violated the "no tag" statute by driving with a temporary paper tag that was folded over, which rendered McLendon's LPR system unable to retrieve Jamison's tag information.

Jamison contends the stop was unsupported by reasonable suspicion because not only is the use of a temporary tag permissible under the statute in question, but also because the tag was entirely visible to McLendon. Jamison submitted an image of the temporary tag as an exhibit.

Under the summary judgment standard, the Court must assume that Jamison's tag was entirely visible and proceed to determine whether McLendon's conduct is protected by qualified immunity.

### C. *Qualified Immunity*

Qualified immunity shields government officials from individual liability as long as their conduct does not violate clearly established statutory or constitutional rights. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "The Plaintiff bears the burden of proving that a governmental official is not entitled to qualified immunity." *Michalik v. Hermann*, 422 F.3d 252, 258 (5th Cir. 2005). The determination of whether a governmental official shall receive qualified immunity is governed by a two-prong analysis, which encompasses: (1) "whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right" and; (2) "whether the right at issue was 'clearly established' at the time of the defendant's alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).

In this case, McLendon argues that even if he lacked reasonable suspicion to conduct the stop, he is protected by qualified immunity.

The Fifth Circuit has held that the reasonable suspicion inquiry is precisely the type of issue for which a qualified immunity analysis is most appropriate. In *Gonzalez v. Huerta*, for example, the Fifth Circuit extended qualified immunity to a school district police officer who handcuffed and detained a suspect for failure to provide identification, even though the officer lacked reasonable suspicion. 826 F.3d 854 (5th Cir. 2016).

Even assuming that Jamison's temporary tag was visible and he was in compliance with the "no tag" statute, McLendon's basis for initiating the traffic stop is protected by qualified immunity. *See Hein v. North Carolina*, 135 S.Ct. 530 (2014) (officer's decision to stop a vehicle for having a missing brake light was based on a reasonable mistake of law, and thus, was not objectively unreasonable). In other words, it was not objectively unreasonable for McLendon to think he could pull Jamison over when the automatic LPR system could not read the temporary tag. Jamison, meanwhile, has not pointed to an authority suggesting otherwise.

It should go without saying that police officers should not be substituting their judgment and expertise for that of a computer. And there may be a case presenting evidence, expert or otherwise, showing how use or misuse of an automated LPR would be objectively unreasonable. Automated LPRs capture hundreds of thousands of license-plate numbers a day, and "the law is constantly playing catch-up." Louis Menand, *Why Do We Care So Much About Privacy?*, THE NEW YORKER, June 18, 2018 (noting that "the city of Oakland collects forty-eight thousand license-plate numbers a day."). But that kind of evidence has not been generated in this case.

McLendon is entitled to summary judgment on the *Terry* stop claim.

## IV. Conclusion

Based on the foregoing, McLendon's Motion for Summary Judgment is GRANTED on Jamison's equal protection and *Terry* stop claims.

Additional briefing would help the Court determine if McLendon is entitled to qualified immunity on Jamison's lack of consent and prolonged stop claims. Within 60 days, therefore, McLendon may renew his motion for summary judgment on the remaining claims.

**SO ORDERED**, this the 26th day of September, 2018.

s/ Carlton W. Reeves
UNITED STATES DISTRICT JUDGE
