IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

CLARENCE JAMISON                                                                              PLAINTIFF

VERSUS                                                                          3:16CV595-CWR-LRA

NICK MCLENDON,
In His Individual Capacity                                                              DEFENDANT

MEMORANDUM IN OPPOSITION TO RENEWED
MOTION [DOC. 63] FOR SUMMARY JUDGMENT

COMES NOW the Plaintiff, Clarence Jamison, by and through counsel of record

and files his Memorandum in Opposition to Renewed Motion [Doc. 63] for Summary

Judgment.  For cause, Mr. Jamison shows the Court as follows:

I.       STATEMENT OF FACTS

On July 29, 2013, Clarence Jamison found himself traveling home, to Neeses,

South Carolina, after vacationing in Las Vegas, Nevada and Phoenix, Arizona.  (Jamison

Dep. at 44-45.)  Mr. Jamison was driving a 2001 model silver Mercedes Benz C Class

convertible which he had finalized the purchase of and picked up on July 16, 2013 from

a dealership in Pennsylvania, after purchasing it on the internet by putting a deposit on

the car almost a month before picking it up.  (Id. at 86-88.)  While driving eastbound on

Interstate 20, in Mississippi, Mr. Jamison passed a patrol vehicle on the right hand

shoulder of the road.  (Id. at 49.)  Immediately after passing the patrol vehicle, it pulled

out behind Mr. Jamison and followed him for approximately a minute before blue-

lighting him.  (Id. at 49-50.)  Mr. Jamison immediately pulled over to the right side of

the Interstate.  (Jamison Dep. at 50.)

At the time of the stop, Mr. Jamison was not speeding and had his seatbelt on.

(Id. at 51.)  The patrol vehicle stopped approximately two to three steps behind Mr.

Jamison's car and the officer waited in his vehicle two or three minutes before

approaching Mr. Jamison's passenger-side window.  (Id. at 52-53.)  The officer, the

Defendant Nick McLendon, asked Mr. Jamison for his driver license, registration, and

proof of insurance and Mr. Jamison complied by providing the requested documents.

(Id. at 53-54.)  The Defendant McLendon then informed Mr. Jamison that he stopped

him for not having a tag.  (McLendon Dep. at 37.)  Despite this statement, Mr. Jamison

had a valid temporary tag issued by the State of Pennsylvania through the dealership

which was properly displayed, *i.e.* bolted to the car.  (Jamison Dep. at 90-92; McLendon

Dep. at 25, 35, 37.)

According to the Defendant McLendon, the sole reason that he stopped Mr.

Jamison was due to his temporary tag.  (Id. at 45.)  In his deposition, the Defendant

McLendon initially justified his stop of Mr. Jamison based on his allegation that Mr.

Jamison's tag could not be read by his computerized tag reading system and he couldn't

see the tag with his eyes.  (Id. at 28.)  The Defendant McLendon then backed away from

part of this justification when he acknowledged that the inability of his computerized

2

tag reading system to read Mr. Jamison's tag was not a cause for stopping Mr. Jamison

since even vehicles with reflective permanent tags cannot be read if the tags are dirty.

(Id. at 29.)  Ultimately, the only justification advanced by the Defendant McLendon for

stopping Mr. Jamison was his disputed allegation that Mr. Jamison's temporary tag was

folded over and he could not read the tag.  (Id. at 28, 31-32.)  This disputed factual

allegation by the Defendant McLendon is refuted by Mr. Jamison's testimony that his

temporary tag was held firmly in place and could not fold over and the Defendant

McLendon's admission that the original cardboard temporary tag he looked at during

his deposition showed no signs of creasing consistent with having been folded over.

(Jamison Dep. at 90-92; McLendon Dep. at 32-33.)[1]

---

[1]In his defense, the Defendant McLendon suggested that any crease in the cardboard temporary tag could have been "ironed out."  (McLendon Dep. at 33-34.)

> Q. Okay. For purposes of your testimony, you agree there's nothing to indicate a crease was ever in that tag and the only suggestion you could offer me is that maybe somebody ironed it?
>
> MR. BUTLER: Object to the form.
>
> BY MR. FLEITAS:
>
> Q. Is that --
>
> A. The only thing I can tell you is the night I stopped him and it was folded or I couldn't visibly see the tag.
>
> Q. Understood. And you agree with me that the tag you're looking at today which was the tag that was on the car that night doesn't have any

While walking to Mr. Jamison's passenger side window ostensibly to initiate contact and speak with him regarding the temporary tag, the Defendant McLendon could see that the temporary tag on Mr. Jamison's car was not expired.  (Id. at 35.)

Q. Was the tag in date?

A. I don't remember but I assume from what's been said here.

Q. Okay. It's written on the tag --

A. Yes, sir.

Q. -- if you'll believe me. And it's also been documented that the tag at that time was not expired.

A. Yes, sir.

Q. Okay. So did you realize that when you went up to talk to Mr. Jamison?

A. Yes, sir.

Q. Okay. Because I'm assuming if the real reason you stopped him was the tag and you were only stopping him because you wanted to make sure that he was driving with a valid tag, by the time you got up to him you'd

_____

folds on it?

A. Yes.

Q. Okay. But the reason you stopped him was because the tag was folded over to where you couldn't see it?

A. Yes, sir.

(Id.)

4

already seen that the tag was in date. Correct?

A. Yes, sir. But it can't be verified on NCIC.  You've got to run the VIN number.

(Id.)

After getting Mr. Jamison's driver license, bill of sale, and proof of insurance, the Defendant McLendon returned to his patrol vehicle where he remained for approximately 10-15 minutes.  (Jamison Dep. at 54-55.)  During that time he examined Mr. Jamison's driver license, and paperwork, and conducted a computerized check on Mr. Jamison's information.  (McLendon Dep. at 38-39.)  The computerized database check performed by the Defendant McLendon showed that Mr. Jamison was clear.  (Id.) The Defendant McLendon then contacted dispatch and requested a NCIC check on Mr. Jamison and the VIN for the car.  (Id. at 39-40.)[2]

As already noted, Mr. Jamison waited in his car for 10-15 minutes, before the Defendant McLendon returned with his driver license, bill of sale, and insurance

---

[2]According to the Defendant McLendon he received verification from dispatch that Mr. Jamison's driver license and car were clear within approximately 5-10 minutes of requesting the information while initiating a consent search of Mr. Jamison's car. (McLendon Dep. at 47-48.)  Mr. Jamison's deposition testimony contradicts this assertion since he testified that the Defendant McLendon took 10-15 minutes in his patrol vehicle before returning to his car and handing him back his driver license. (Jamison Dep. at 54-55.)  Crediting Mr. Jamison's testimony means that the Defendant McLendon knew that Mr. Jamison's record was clean and the ostensible reason for stopping and detaining him was resolved, before returning to Mr. Jamison's car and purposely prolonging the stop in order to engage in a snipe-hunt for non-existent narcotics.

information.  (Jamison Dep. at 55.)  When the Defendant McLendon handed back Mr.

Jamison's documentation, he made no mention of any irregularity with respect to his

driver license, or vehicle, or the need to await additional information from dispatch.

(Id. at 63.)  The Defendant McLendon asked Mr. Jamison for consent to search his car.

(Id. at 56, 62.)  Mr. Jamison refused consent and the Defendant McLendon changed the

subject to start talking about Mr. Jamison's work as a welder.  (Id. at 57.)

After making small-talk geared towards establishing a rapport with Mr. Jamison

and securing consent or some reason to justify a search, the Defendant McLendon asked

Mr. Jamison for consent again.[3]  (Jamison Dep. at 58; McLendon Dep. at 42.)  Again, Mr.

Jamison refused consent and the Defendant McLendon then told Mr. Jamison that he

had received an anonymous tip that there were ten kilograms of cocaine in his car.

(Jamison Dep. at 58, 63-64.)  The Defendant McLendon was rude in making the

allegation regarding the ten kilograms of cocaine in Mr. Jamison's car and generally

about his insistence in wanting to search Mr. Jamison's car.  (Id. at 63.)  When Mr.

Jamison asked why the Defendant McLendon insisted in wanting to search his car, the

Defendant McLendon repeatedly made reference to there being ten kilograms of

---

[3]Though not relevant for summary judgment purposes, the Defendant McLendon denies repeatedly asking Mr. Jamison for consent to search while keeping his arm inside of Mr. Jamison's car to keep him from driving away.  (McLendon Dep. at 47.)  According to the Defendant McLendon he simply asked Mr. Jamison for consent to search one or two times and Mr. Jamison gave him consent to search.  (Id. at 46-47, 71.)

cocaine in Mr. Jamison's car.  (<u>Id.</u> at 63-64.)

Despite telling the Defendant McLendon several times that there were no drugs in his car, the Defendant McLendon persisted in asking Mr. Jamison for consent to search while keeping his arm inside of Mr. Jamison's car thus preventing him from going on his way.  (<u>Id.</u> at 59-60.)  In addition to telling Mr. Jamison that he had received an anonymous call regarding there being ten kilograms of cocaine in his car, the Defendant McLendon told Mr. Jamison that his license was suspended, that his car was stolen, and that he did not have insurance.  (<u>Id.</u> at 83-85.)  The Defendant McLendon also attempted to encourage Mr. Jamison to consent to a search by saying that he would not arrest him if he only found a small amount of drugs in the car.[4]  (McLendon Dep. at

---

[4]The Defendant McLendon's candid testimony about securing "consent" in this manner is noteworthy:

> Q. Back on the record after a short break. Did you ever make a remark to Mr. Jamison about a roach?
>
> A. Probably.
>
> Q. All right. Why do you say probably?
>
> A. *Because sometimes if people -- you know, they can get kind of hesitant on giving consent because they got a dime bag of marijuana in the car or a roach in the ashtray, and I always tell the people hey, if you've just got a small amount of marijuana you give it up, you go on about your road, I pull the case, I destroy it just to kind of alleviate wasting ti[m]e.*
>
> Q. Did you ever make any statement to him to the effect of look, man if

78.)  The Defendant McLendon also told Mr. Jamison that when he had a hunch there were drugs in a car, he was right 90% of the time.  (Id. at 77.)

After asking Mr. Jamison four or five times for consent to search his car, Mr. Jamison finally relented given that the Defendant McLendon kept his arm in his car and refused to allow Mr. Jamison to go on his way without permitting him to search. (Jamison Dep. at 61; Jamison Statement at 33-35.)

Mr. Jamison, concerned that drugs might be planted in his car, requested that any search of his vehicle be conditioned on being able to see the Defendant McLendon conduct the search.  (Jamison Dep. at 61.)  At this point, the Defendant McLendon came around to the driver side of Mr. Jamison's car, asked him to step out of the car and patted him down, before instructing him to stand in from of his patrol vehicle.  (Jamison Dep. at 64-66; McLendon Dep. at 49-50.)  The Defendant McLendon's search of Mr. Jamison was extremely thorough and time consuming.  (Jamison Dep. at 67.)  At one

---

you've got a little roach or something like that I'm not worried about that. I'm just going to throw that away?

A. Possibly.

Q. All right. That's not a truthful statement, is it?

A. Sometimes. *If it's just a little roach, I make them play soccer on the side of the road with it, kick it in the dirt. Sometimes if it's a bag I pull a case and destroy it.*

(McLendon Dep. at 78-79 (emphasis added).)

8

point during the search, Mr. Jamison complained that he could not see what the Defendant McLendon was doing and sought to withdraw his consent to search.  (Id. at 69-70.)  The Defendant McLendon told Mr. Jamison that he could not withdraw his consent once given and continued searching Mr. Jamison's car.[5]  (Id.)

In conducting his search of Mr. Jamison's car, the Defendant McLendon caused damage to a driver side vent, the seats, and the convertible top (Id. at 75-76.)  After the search, the Defendant McLendon handed Mr. Jamison a small flashlight and told him to look over his car in the dark for damage and that he would pay for any damage to his car.  (Id. at 78-79.)  A tired Mr. Jamison looked for approximately a minute before telling the Defendant McLendon that he could not see any damage to his car.  (Jamison Dep. at 78-79.)  The Defendant McLendon then issued Mr. Jamison a "Courtesy Warning" for driving with "no tag."  (Jamison Dep. at 97-98; McLendon Dep. 64-65.)  In all, Mr. Jamison felt as though he had been detained on the side of the road for approximately three-and-a-half hours.  (Jamison Dep. at 80.)  According to the Defendant McLendon, he detained Mr. Jamison for one hour and fifty minutes.  (McLendon Dep. at 26.) Despite having a K-9 officer in his patrol vehicle the entire time, the Defendant McLendon did not ask Mr. Jamison for permission to use the K-9 until the end of his

---

[5]According to the Defendant McLendon, Mr. Jamison did not talk to him about withdrawing his consent to search.  (McLendon Dep. at 50.)  The Defendant McLendon admitted that Mr. Jamison was not free to leave the stop unless he withdrew his consent to search.  (Id.)

search and the encounter.  (Jamison Dep. at 70; McLendon Dep. at 57-58.)  The K-9 did

not alert to the presence of drugs in Mr. Jamison's car.  (McLendon Dep. at 57-58.)

The Defendant McLendon admitted that the only reason he stopped Mr. Jamison

was because he viewed his temporary tag as amounting to driving with no tag and/or

because he could not read the temporary tag because it was folded over.  (Id. at 44-45,

65.)  Mr. Jamison had committed no other infraction which would have justified

stopping him.  (Id.)  Once he stopped Mr. Jamison and approached his car, the

Defendant McLendon could see that Mr. Jamison's car had a properly mounted and in

date temporary tag issued by Pennsylvania.  (Id. at 34-35.)  Mr. Jamison's driver license

was valid; his bill of sale and other documentation proved his lawful ownership of the

car; and he had proof of insurance for the car.  (Id. at 36, 69.)

From the start of his encounter with Mr. Jamison, the Defendant McLendon's

sole goal was to conduct a search of Mr. Jamison's car for narcotics.  (McLendon Dep. at

44-46.)

Q. Tell me what probable cause you had or what -- tell me what articuable
[sic] suspicion you had at the time you requested consent.

A. I didn't need any, but the recently purchased vehicle, traveling all the
way across the country, coming from Phoenix, Arizona, a source area, and
headed back to South Carolina.

Q. And for those reasons you believe that you didn't even need his
consent?

A. Yes. If I didn't need his consent I would have just searched it.

Q. Did you need his consent?

A. That or probable cause.

Q. You didn't have probable cause.

A. Not at that time.

Q. And you didn't get probable cause?

A. No, sir.

Q. All right. So the only lawful basis that there would have been for the search of the vehicle that you agree with me is the allegation. There's the question of consent.

MR. BUTLER: Object to the form. You can answer.

BY MR. FLEITAS:

Q. Outside of the consent there was no basis for you searching Mr. Jamison's vehicle. Correct?

MR. BUTLER: Object to the form.

A. I don't understand the question.

BY MR. FLEITAS:

Q. If he had said I'm not giving you consent --

A. I would have ran my police department canine.

Q. All right. And it would have shown nothing.

A. Possibly.

Q. Well, it didn't.

A. Yes.

Q. I mean, you ran it. It showed nothing.

A. Yes, that's true.

Q. So you would have run the canine. At that point he would have been there -- what? -- 10, 15 minutes?

A. Maybe.

Q. You would have run the canine. Right?

A. Yes, sir.

Q. First?

A. Yes, sir. If he would have refused consent.

Q. And it wouldn't have indicated?

A. No, sir.

Q. Because that process can never be manipulated. Right?

A. It can be.

Q. It sure can.

A. Mine is not.

Q. I understand.

A. Not on a Mercedes.

Q. I'm just saying. So you would have run the dog. The dog would have

shown nothing and --

A. He'd have been free to go.

Q. He'd have been free to go. So you agree with me there was no probable cause to search Mr. Jamison's vehicle?

MR. BUTLER: Object to the form.

BY MR. FLEITAS:

Q. The search was solely lawful based on consent?

MR. BUTLER: Same objection.

A. Correct.

BY MR. FLEITAS:

Q. All right. Absent consent if he had just said no, no, no, no, no. Okay, well, I'm going to run my dog. You run your dog. The dog doesn't indicate.

A. He's free to go.

Q. All right. I'm just trying to make sure what the issues are in the case. I'm not trying to be difficult.

A. That's fine.

Q. And I understand we have a fundamental disagreement about what you gentlemen said to one another on the side of the road. That's why we're here. Having said that, though, I just want to make sure that there's not some other basis other than consent that you would be alleging justified you to search that vehicle. So outside of the consent no search. Correct?

MR. BUTLER: Object to the form.

A. Correct.

(Id. at 56-59.)

II.     SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A factual " issue is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the non-moving party," and "'material' if its resolution could affect the outcome of the action."  Burrell v. Dr. Pepper/Seven Up Bottling Grp., Inc., 482 F.3d 408, 411 (5th Cir. 2007).  In reviewing a summary judgment, all facts and inferences must be construed in the light most favorable to the non-moving party.  Burrell, 482 F.3d at 411.

The party seeking summary judgment carries the burden of demonstrating that there is no evidence to support the nonmovant's case. "  Hirras v. National R.R. Passenger Corp., 95 F.3d 396, 399 (5th Cir. 1996) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)).  In ruling on a motion for summary judgment, the court is not to make credibility determinations, weigh evidence, or draw from the facts legitimate inferences for the movant.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  Rather, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.  Anderson, 477 U.S. at 255.

III.    QUALIFIED IMMUNITY STANDARD

The doctrine of qualified immunity protects public officials acting within the scope of their official duties from civil liability so long "as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  In order to overcome the Defendant McLendon's assertion of qualified immunity in this case, Mr. Jamison must establish (1) that he has asserted the violation of a constitutional right; (2) that was clearly established at the time of the Defendant McLendon's actions; and (3) that the Defendant McLendon's actions were objectively unreasonable.  Eugene v. Alief Indep. Sch. Dist., 65 F.3d 1299, 1305 (5th Cir. 1995) (citing Siegert v. Gilley, 500 U.S. 226, 232 (1992)).  Where factual disputes exist regarding the assertion of qualified immunity during summary judgment, the Mr. Jamison's version of the facts is accepted as true. Kinney v. Weaver, 367 F.3d 337, 348 (5th Cir. 2004).

IV.    ARGUMENT & AUTHORITIES

The Defendant McLendon renews his assertion that he is entitled to summary judgment based on qualified immunity with respect to Mr. Jamison's Fourth Amendment claims for unlawfully prolonging his detention by the side of the road, for unlawfully searching his automobile, and for unreasonably damaging his automobile in the process of unlawfully searching it.  Despite being granted qualified iimmunity for

his initial stop of Mr. Jamison, the Defendant McLendon's claim to qualified immunity for his additional constitutional torts fails based on clearly established law of which a reasonable officer would be aware.

A.    The Facts Found To Be Material By The Court, In Assessing The Defendant McLendon's Renewed Motion For Summary Judgment.

In entering its Order granting the Defendant Mclendon qualified immunity with respect to his initial stop of Mr. Jamison, this Court found the following facts material:

• McLendon's automated LPR system did not read Jamison's license plate.

• Upon stopping Jamison, McLendon saw that Jamison's license plate was readable and not folded over.

• The background checks did not reveal any criminal history, outstanding fines, or warrants for Jamison.

• McLendon's goal was to search Jamison's vehicle.

• McLendon falsely claimed to have received an anonymous tip that Jamison had 10 kilograms of cocaine in the vehicle

•  In hopes of searching Jamison's vehicle, McLendon promised Jamison

• that if he found a roach of marijuana in the car, he would throw it to the side of the road.

• Jamison did not voluntarily consent to the search, but instead was coerced by McLendon's repeated requests and by McLendon placing his arm in

Jamison's passenger window.

- McLendon's K-9 sat in the patrol car for over an hour before it was allowed to sniff around Jamison's vehicle. The K-9 did not alert to the presence of drugs.

- McLendon's encounter with Jamison lasted an hour and fifty minutes.

(Order at 5-6.)

These factual findings and other genuine issues of material fact regarding the Defendant McLendon's unlawful prolongation of the initial stop, unlawful coercion of Mr. Jamison to gain consent to search, and objectively unreasonable damaging of Mr. Jamison's automobile foreclose qualified immunity and compel a resolution by the trier of fact on the merits.

B.    The Defendant McLendon's Prolonged Detention Of Mr. Jamison Violated The Fourth Amendment.

The Defendant McLendon asserts that his prolonged detention of Mr. Jamison, lasting approximately two hours, passes constitutional muster.  Contrary to the Defendant McLendon's assertion, the disputed material facts regarding the circumstances under which he unlawfully prolonged the detention of Mr. Jamison fail constitutional muster.

As already noted, once the Defendant McLendon stopped Mr. Jamison, he asked for and received Mr. Jamison's driver license, proof of ownership, and proof of

insurance.  (Jamison Dep. at 54.)  According to Mr. Jamison, the Defendant McLendon

then took these items to his patrol vehicle and remained there for approximately 10-15

minutes.  (Id. at 55.)  Upon returning to the passenger side of Mr. Jamison's car, the

Defendant McLendon returned the items that Mr. Jamison had handed him previously

and Mr. Jamison believed he had completed the check on his driver license.  (Jamison

Statement at 5-7, 13-14.)  As Mr. Jamison was preparing to go, the Defendant McLendon

put his arm inside of Mr.. Jamison's car and prevented him from resuming his travel

while telling Mr. Jamison to, "Hold on!" and that he received a call saying that there

were ten kilograms of cocaine in the car.  (Id. at 6.)  It was then that the Defendant

McLendon made clear to Mr. Jamison through word and deed that he would not be

permitted to leave until he gave "consent" to search his car.  (Id. at 7.)

It cannot be emphasized enough for purposes of the constitutional inquiry at

issue here that (1) Defendant McLendon resolved the reason for the initial stop *before* he

first engaged Mr. Jamison when he observed the temporary tag was valid; and (2) Mr.

Jamison had his license, proof of insurance, and proof of ownership returned to him, by

the Defendant McLendon, *before* he was verbally and physically barred from leaving the

traffic stop and subsequently detained for an additional hour and a half.

It is axiomatic that,  "[o]nce the purpose of a  valid traffic stop has been

completed and an officer's initial suspicions have been verified or dispelled, the

detention must end unless there is additional reasonable suspicion supported by articulable facts." United States v. Estrada, 459 F.3d 627, 631 (5th Cir. 2006). Also, an investigative traffic detention "may last no longer than required to effect the purpose of the stop." United States v. Jenson, 462 F.3d 399, 404 (5th Cir. 2006).

The Defendant McLendon attempts to independently bolster his prolonged detention of Mr. Jamison and his illegal search by focusing on several entirely innocent facts: (1) Mr. Jamison drove from Phoenix, Arizona, a "known drug location;"[6] (2) Mr. Jamison drove on Interstate 20, a "known drug route;"[7] Mr. Jamison drove a car he purchased in Pennsylvania only thirteen days before being stopped with money he lawfully earned and obtained; Mr. Jamison was in possession of a valid driver license issued by the State in which he resided; and Mr. Jamison had a valid temporary tag issued by the State where he had purchased his car. As this Court noted in United States v. Alvarado, No. 3:12CR113-CWR-FKB at 8 (S.D. Miss. Oct. 2, 2013), "[s]uspicions clearly based on lawful conduct, or at least conduct in which law-abiding citizens are

---

[6]Narcotic drugs in the United States are ubiquitous. Is any place in this Nation, urban or rural, not a known drug location or not subject to being referred to as such?

[7]Other "known drug routes" include every Interstate in the United States. See https://www.justice.gov/archive/ndic/pubs11/18862/transport.htm. According to the National Drug Threat Assessment 2006, by the National Drug Intelligence Center, "[v]irtually every interstate and highway in the United States is used by traffickers to transport illicit drugs to and from distribution centers and market areas throughout the country, and every highway intersection provides alternative routes to drug markets." Id. Interstate 20 through Mississippi did not crack the top eight. Id.

just as likely to be engaged, are not reasonable." United States v. Lopez, 817 F. Supp.

2d 918, 926n.57 (S.D. Miss. 2011) (citing United States v. Rangel-Portillo, 586 F.3d 376,

381 (5th Cir. 2009)).

In Edgerton v. United States, 438 F.3d 1043, 1051 (10th Cir. 2006), under nearly

identical circumstances to those facing the Court here, the court found no difficulty in

determining an officer who prolonged a traffic stop for an alleged temporary tag

violation transgressed the constitutional rights of the driver when he prolonged the stop

after verifying the temporary tag was valid and properly displayed.

United States v. Rodriguez, 135 S. Ct 1609 (2015) provides the rule of decision in

this case and compels the denial of qualified immunity based on the Defendant

McLendon's clearly unreasonable prolongation of the traffic stop to engage in a search

for non-existent drugs.  Rodriquez instructs all officers, "[b]ecause addressing the

infraction is the purpose of the stop, it may 'last no longer than is necessary to effectuate

th[at] purpose.'" Rodriguez, 135 S. Ct. at 1614 (quoting Florida v. Royer, 460 U.S. 491,

500 (1983).  During routine traffic stops, police are permitted to conduct "ordinary

inquiries incident to [the traffic stop]." Id. at 1615.  This includes "checking the driver's

license, determining whether there are outstanding warrants against the driver, and

inspecting the automobile's registration and proof of insurance." Id.  Some of these

incidental inquires may not be permissible if it becomes apparent no traffic violation

occurred, such as the case here.  Id.  However, what is clear is that police are not

allowed to use the time that would have been needed for incidental inquiries as "bonus

time" to venture out and conduct unrelated investigations.  Id. at 1616.

Here, the competent summary judgment evidence supports the conclusion that

the Defendant McLendon unlawfully prolonged Mr. Jamison's detention, after the

initial stop, by ordering Mr. Jamison to "Hold it!" and by physically preventing Mr.

Jamison from resuming his travel by placing his arm inside Mr. Jamison's automobile.

At the time the Defendant McLendon engaged in these verbal and physical delaying

tactics, he knew the reason for the initial stop had been resolved and that Mr. Jamison

had passed all of the driver license and other checks run on him.  No additional

evidence was adduced based on Mr. Jamison's answers to the Defendant McLendon's

questions which gave rise to probable cause or articulable suspicion.  The Defendant

Mclendon admitted the absence of any basis to search Mr. Jamison's car when he stated

that absent getting consent from Mr. Jamison he had no basis to justify a search of his

car.  (McLendon Dep. at 57.)

C.     Mr. Jamison's Alleged Consent to Search His Car Is Invalidated By His
       Prolonged Detention And Coercion By The Defendant McLendon.

The Defendant McLendon's suggestion that Mr. Jamison freely and voluntarily

consented to the search of his car lacks arguable merit on this record.  Consent is a

recognized exception to the Fourth Amendment requirement that a search be supported

by a warrant or probable cause.  United States v. Scroggins, 599 F.3d 433, 440 (5th Cir. 2010).  The Defendant McLendon has the burden of proving that the consent was voluntary.  United States v. Arias-Robles, 477 F.3d 245, 248 (5th Cir. 2007).  In considering the voluntariness of the consent, a court should consider the following relevant factors: (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found.  Arias-Robles, 477 F.3d 248.

Before assessing these factors, it must be noted that a finding by the Court the Defendant McLendon unconstitutionally prolonged Mr. Jamison's detention, negates the claimed validity of any consent to search, as fruit of the poisonous tree.  See Westfall v. Luna, No. 16-11234 (5th Cir. Sep. 13, 2018) ("Where officers continue an illegal search or seizure, any consent given after that fact is invalid, unless it was an independent act of free will."); United States v. Rivas, 157 F.3d 364, 368 (5th Cir. 1998) ("Under the 'fruit of the poisonous tree' doctrine, all evidence derived from the exploitation of an illegal search or seizure must be suppressed, unless the Government shows that there was a break in the chain of events sufficient to refute the inference that the evidence was a product of the Fourth Amendment violation.")

Assessing the factors, first, the Defendant McLendon admitted that Mr. Jamison's interactions with him were neither voluntary nor consensual as he was never free to leave at any time either prior to or until after the search was conducted.  Second, Mr. Jamison was verbally and physically kept from resuming his travel home, after having his driver license and other documents returned to him, when the Defendant McLendon told him to, "Hold it!" placed his arm inside his car and badgered him for "consent."  In addition, the Defendant McLendon shockingly offered to disregard criminality in exchange for consent to search.  Third, though Mr. Jamison cooperated with the Defendant McLendon's requests, their exchanges became heated, as the Defendant McLendon repeatedly leveled false allegations and encroached on Mr. Jamison's liberty interest in freedom from unlawful detention.  Fourth, though aware of his right to refuse consent, Mr. Jamison was made aware that, without relenting to the Defendant McLendon's repeated demands for consent, he might never get back home.  Fifth, Mr. Jamison has a high school education, is intelligent, and works as a skilled tradesman. Sixth, Mr. Jamison knew to a certainty that no drugs would be found in his car unless law enforcement planted them.

Taking all of these factors together, in light of the disputed facts, a genuine issue of material fact exists regarding the voluntariness of Mr. Jamison's alleged consent to allow the Defendant McLendon to search his car.  When this factually disputed question

of voluntariness is considered in light of a detention which lasted for a minimum of almost two hours, a summary disposition of this civil action in favor of the Defendant McLendon is not justified.  See <u>Alvarado</u>, No. 3:12CR113-CWR-FKB at 26 n.21 ("For an entire hour, he stood along the side of the highway for reasons not tied to reasonable suspicion that he had committed a crime or was engaged in the commission of a crime. This is unacceptable.")

In <u>Jordan v. Wayne County</u>, No. 2:16CV70-KS-MTP at 13-15 (S.D. Miss. May 17, 2017), the district court considered conflicting factual accounts related to the question of consent and determined that qualified immunity was inappropriate based on those factual conflicts.  As noted earlier, this court found as a matter of material fact, based on the summary judgment record, that Mr. Jamison was subjected to coercion by the Defendant McLendon.  In light of the substantial evidence of coercion by the Defendant Mclendon a genuine issue of material fact exists as to his entitlement to qualified immunity.

      D.    <u>The Defendant McLendon Is Not Entitled To Summary Judgment With Regard To Mr. Jamison's Claim For Unnecessary Damage to His Car.</u>

Mr. Jamison alleged in his Complaint and throughout this litigation the Defendant McLendon unreasonably cause damage to his car while engaging in the illegal search.  In light of genuine issues of material fact regarding this claim, summary judgment as to this claim is inappropriate.

24

The law is clearly established in the Fifth Circuit that general consent to search a vehicle gives an officer authority to a search under the hood of the car.  United States v. McSween, 53 F.3d 684, 688 (5th Cir. 1995).  This authority extends to the vehicle's components so long as they can be searched without causing damage to the vehicle. United States v. Garcia, 604 F.3d 186, 190 (5th Cir. 2010); United States v. Flores, 63 F.3d 1342, 1362 (5th Cir. 1995).

In this case, Mr. Jamison alleges that significant damage was done to his car as a result of a needless and unreasonable search for drugs conducted in parts of the car (convertible top, seats, etc.) which were easily damaged.  Given the presence of disputed issues of fact regarding the reasonableness of the search conducted by the Defendant McLendon, summary judgment as to this issue should be submitted to the trier of fact at a trial on the merits.

V.     CONCLUSION

For the reasons stated above and premised on the existence of genuine issues of material fact, Mr. Jamison requests that the Court deny the Defendant McLendon's Renewed Motion [Doc. 63] for Summary Judgment.

Respectfully submitted, this the 10th day of December, 2018.

/s/ Victor Israel Fleitas

_____

VICTOR I. FLEITAS
MS BAR NO. 10259

Victor I. Fleitas, P.A.
452 North Spring Street
Tupelo, Mississippi 38804
(662) 840-0270 / Telephone
(662) 840-1047 / Facsimile
fleitasv@bellsouth.net / Email

Attorney for Clarence Jamison

CERTIFICATE OF SERVICE

I hereby certify that on December 10, 2018 I electronically filed the foregoing with

the Clerk of the Court using the ECF system which sent notification of such filing to the

following:

Gregory Todd Butler, Esq.
Phelps Dunbar
4270 I-55 North
Jackson, Mississippi 39211-6391
butlert@phelps.com

This the 10th day of December, 2018.

/s/ Victor Israel Fleitas

_____

VICTOR I. FLEITAS