

_____

No. 3:16-CV-595-CWR-LRA

CLARENCE JAMISON,

*Plaintiff,*

*v.*

NICK MCCLENDON,
*In his individual capacity,*

*Defendant.*

_____

ORDER GRANTING QUALIFIED IMMUNITY
_____

Before CARLTON W. REEVES, *District Judge.*

Clarence Jamison wasn't jaywalking.[1]

He wasn't outside playing with a toy gun.[2]

---

[1] That was Michael Brown. *See* Max Ehrenfreund, *The risks of walking while black in Ferguson,* WASH. POST (Mar. 4, 2015).

[2] That was 12-year-old Tamir Rice. *See* Zola Ray, *This Is The Toy Gun That Got Tamir Rice Killed 3 Years Ago Today,* NEWSWEEK (Nov. 22, 2017).

He didn't look like a "suspicious person."[3]

He wasn't suspected of "selling loose, untaxed cigarettes."[4]

He wasn't suspected of passing a counterfeit $20 bill.[5]

He didn't look like anyone suspected of a crime.[6]

He wasn't mentally ill and in need of help.[7]

He wasn't assisting an autistic patient who had wandered away from a group home.[8]

---

[3] That was Elijah McClain. *See* Claire Lampen, *What We Know About the Killing of Elijah McClain*, THE CUT (July 5, 2020).

[4] That was Eric Garner. *See* Assoc. Press, *From Eric Garner's death to firing of NYPD officer: A timeline of key events*, USA TODAY (Aug. 20, 2019).

[5] That was George Floyd. *See* Jemima McEvoy, *New Transcripts Reveal How Suspicion Over Counterfeit Money Escalated Into The Death Of George Floyd*, FORBES (July 8, 2020).

[6] That was Philando Castile and Tony McDade. *See* Andy Mannix, *Police audio: Officer stopped Philando Castile on robbery suspicion*, STAR TRIB. (July 12, 2016); Meredith Deliso, *LGBTQ community calls for justice after Tony McDade, a black trans man, shot and killed by police*, ABC NEWS (June 2, 2020).

[7] That was Jason Harrison. *See* Byron Pitts et al., *The Deadly Consequences When Police Lack Proper Training to Handle Mental Illness Calls*, ABC NEWS (Sept. 30, 2015).

[8] That was Charles Kinsey. *See Florida policeman shoots autistic man's unarmed black therapist*, BBC (July 21, 2016).

He wasn't walking home from an after-school job.[9]

He wasn't walking back from a restaurant.[10]

He wasn't hanging out on a college campus.[11]

He wasn't standing outside of his apartment.[12]

He wasn't inside his apartment eating ice cream.[13]

He wasn't sleeping in his bed.[14]

He wasn't sleeping in his car.[15]

---

[9] That was 17-year-old James Earl Green. *See* Robert Luckett, *In 50 Years from Gibbs-Green Deaths to Ahmaud Arbery Killing, White Supremacy Still Lives*, JACKSON FREE PRESS (May 8, 2020); *see also* Robert Luckett, *50 Years Ago, Police Fired on Students at a Historically Black College*, N.Y. TIMES (May 14, 2020); Rachel James-Terry & L.A. Warren, *'All hell broke loose': Memories still vivid of Jackson State shooting 50 years ago*, CLARION LEDGER (May 15, 2020).

[10] That was Ben Brown. *See* Notice to Close File, U.S. DEP'T OF JUSTICE, CIVIL RIGHTS DIV. (Mar. 24, 2017), *available at* https://www.justice.gov/crt/case-document/benjamin-brown-notice-close-file; *see also* Jackson State Univ., Center for University-Based Development, *The Life of Benjamin Brown, 50 Years Later*, W. JACKSON (May 11, 2017).

[11] That was Phillip Gibbs. *See* James-Terry & Warren, *supra*.

[12] That was Amadou Diallo. *See Police fired 41 shots when they killed Amadou Diallo. His mom hopes today's protests will bring change.*, CBS NEWS (June 9, 2020).

[13] That was Botham Jean. *See* Bill Hutchinson, *Death of an innocent man: Timeline of wrong-apartment murder trial of Amber Guyger*, ABC NEWS (Oct. 2, 2019).

[14] That was Breonna Taylor. *See* Amina Elahi, *'Sleeping While Black': Louisville Police Kill Unarmed Black Woman*, NPR (May 13, 2020).

[15] That was Rayshard Brooks. *See* Jacob Sullum, *Was the Shooting of Rayshard Brooks 'Lawful but Awful'?*, REASON (June 15, 2020).

He didn't make an "improper lane change."[16]

He didn't have a broken tail light.[17]

He wasn't driving over the speed limit.[18]

He wasn't driving under the speed limit.[19]

No, Clarence Jamison was a Black man driving a Mercedes convertible.

As he made his way home to South Carolina from a vacation in Arizona, Jamison was pulled over and subjected to one hundred and ten minutes of an armed police officer badgering him, pressuring him, lying to him, and then searching his car top-to-bottom for drugs.

Nothing was found. Jamison isn't a drug courier. He's a welder.

Unsatisfied, the officer then brought out a canine to sniff the car. The dog found nothing. So nearly two hours after it started, the officer left Jamison by the side of the road to put his car back together.

---

[16] That was Sandra Bland. *See* Ben Mathis-Lilley & Elliott Hannon, *A Black Woman Named Sandra Bland Got Pulled Over in Texas and Died in Jail Three Days Later. Why?*, SLATE (July 16, 2015).

[17] That was Walter Scott. *See* Michael E. Miller et al., *How a cellphone video led to murder charges against a cop in North Charleston, S.C.*, WASH. POST (Apr. 8, 2015).

[18] That was Hannah Fizer. *See* Luke Nozicka, *'Where's the gun?': Family of Sedalia woman killed by deputy skeptical of narrative*, KANSAS CITY STAR (June 15, 2020).

[19] That was Ace Perry. *See* Jodi Leese Glusco, *Run-in with Sampson deputy leaves driver feeling unsafe*, WRAL (Feb. 14, 2020).

Thankfully, Jamison left the stop with his life. Too many others have not.[20]

The Constitution says everyone is entitled to equal protection of the law – even at the hands of law enforcement. Over the decades, however, judges have invented a legal doctrine to protect law enforcement officers from having to face any consequences for wrongdoing. The doctrine is called "qualified immunity." In real life it operates like absolute immunity.

In a recent qualified immunity case, the Fourth Circuit wrote:

> Although we recognize that our police officers are often asked to make split-second decisions, we expect them to do so with respect for the dignity and worth of black lives.[21]

This Court agrees. Tragically, thousands have died at the hands of law enforcement over the years, and the death toll continues to rise.[22] Countless more have suffered from other

---

[20] *See, e.g.*, Mike Baker et al., *Three Words. 70 cases. The tragic History of 'I Can't Breathe.'*, N.Y. TIMES (June 29, 2020) (discussing the deaths of Eric Garner, George Floyd, and 68 other people killed while in law enforcement custody whose last words included the statement, "I can't breathe.").

[21] *Estate of Jones v. City of Martinsburg, W. Virginia*, 961 F.3d 661, 673 (4th Cir. 2020), *as amended* (June 10, 2020).

[22] Mark Berman et al., *Protests spread over police shootings. Police promised reforms. Every year, they still shoot and kill nearly 1,000 people.*, WASH. POST (June 8, 2020) ("Since 2015, police have shot and killed 5,400 people."); *see also* Alicia Victoria Lozano, *Fatal Encounters: One man is tracking every officer-involved killing in the U.S.*, NBC NEWS (July 11, 2020), ("As of July 10, Fatal Encounters lists more than 28,400 deaths dating to Jan. 1, 2000. The entries include both headline-making cases and thousands of lesser-known deaths.").

forms of abuse and misconduct by police.[23] Qualified immunity has served as a shield for these officers, protecting them from accountability.

This Court is required to apply the law as stated by the Supreme Court. Under that law, the officer who transformed a short traffic stop into an almost two-hour, life-altering ordeal is entitled to qualified immunity. The officer's motion seeking as much is therefore granted.

But let us not be fooled by legal jargon. Immunity is not exoneration. And the harm in this case to one man sheds light on the harm done to the nation by this manufactured doctrine.

As the Fourth Circuit concluded, "This has to stop."[24]

## I.    Factual and Procedural Background[25]

On July 29, 2013, Clarence Jamison was on his way home to Neeses, South Carolina after vacationing in Phoenix, Arizona. Jamison was driving on Interstate 20 in a 2001 Mercedes-Benz CLK-Class convertible. He had purchased the vehicle 13 days before from a car dealer in Pennsylvania.

---

[23] *See, e.g.,* Jamie Kalven, *Invisible Institute Relaunches The Citizens Police Data Project*, THE INTERCEPT (Aug. 16, 2018) (discussing "a public database containing the disciplinary histories of Chicago police officers . . . . It includes more than 240,000 allegations of misconduct involving more than 22,000 Chicago police officers over a 50-year period."); Andrea J. Ritchie, *How some cops use the badge to commit sex crimes*, WASH. POST (Jan. 12., 2018) ("According to a 2010 Cato Institute review, sexual misconduct is the second-most-frequently reported form of police misconduct, after excessive force.").

[24] *Estate of Jones,* 961 F.3d at 673.

[25] The facts are drawn from the parties' depositions.

As Jamison drove through Pelahatchie, Mississippi, he passed Officer Nick McClendon, a white officer with the Richland Police Department, who was parked in a patrol car on the right shoulder.[26] Officer McClendon says he decided to stop Jamison because the temporary tag on his car was "folded over to where [he] couldn't see it." Officer McClendon pulled behind Jamison and flashed his blue lights. Jamison immediately pulled over to the right shoulder.[27]

As Officer McClendon approached the passenger side of Jamison's car, Jamison rolled down the passenger side window. Officer McClendon began to speak with Jamison when he reached the window. According to McClendon, he noticed that Jamison had recently purchased his car in Pennsylvania, and Jamison told him that he was traveling from "Vegas or Arizona."

Officer McClendon asked Jamison for "his license, insurance, [and] the paperwork on the vehicle because it didn't have a tag." Jamison provided his bill of sale, insurance, and South Carolina driver's license. Officer McClendon returned to his car to conduct a background check using the El Paso Intelligence Center ("EPIC"). The EPIC check came back clear immediately. Officer McLendon then contacted the National Criminal Information Center ("NCIC") and asked the dispatcher to run a criminal history on Jamison as well as the VIN on his car.

---

[26] That night, Officer McClendon was working in Pelahatchie pursuant to an interlocal agreement between the Richland and Pelahatchie Police Departments.

[27] Jamison testified that there were two other officers on the scene. The record does not contain any evidence from these individuals.

7

According to Officer McClendon, he walked back to the passenger side of Jamison's car before hearing from NCIC.[28] He later admitted in his deposition that his goal when he returned to Jamison's car was to obtain consent to search the car. Once he reached the passenger side window, Officer McClendon returned Jamison's documents and struck up a conversation without mentioning that the EPIC background check came back clear. Thinking he was free to go after receiving his documents, Jamison says he prepared to leave.

This is where the two men's recounting of the facts diverges. According to Officer McClendon, he asked Jamison if he could search his car. Jamison asked him, "For what?" Officer McClendon says he responded, "to search for illegal narcotics, weapons, large amounts of money, anything illegal," and that Jamison simply gave his consent for the search.

According to Jamison, however, as he prepared to leave, Officer McClendon put his hand over the passenger door threshold of Jamison's car and told him to, "Hold on a minute." Officer McClendon then asked Jamison – for the first time – if he could search Jamison's car. "For what?" Jamison replied. Officer McClendon changed the conversation, asking him what he did for a living. They discussed Jamison's work as a welder.

Officer McClendon asked Jamison – for the second time – if he could search the car. Jamison again asked, "For what?" Officer McClendon said he had received a phone call reporting

---

[28] This part of Officer McClendon's testimony is undisputed. Jamison testified that he did not know if Officer McClendon heard back from NCIC prior to returning to Jamison's car.

that there were 10 kilos of cocaine in Jamison's car.[29] That was a lie. Jamison did not consent to the search.

Officer McClendon then made a third request to search the car. Jamison responded, "there is nothing in my car." They started talking about officers "planting stuff" in people's cars.

At this point, Officer McClendon "scrunched down," placed his hand into the car, and patted the inside of the passenger door. As he did this, Officer McClendon made his fourth request saying, "Come on, man. Let me search your car." Officer McClendon moved his arm further into the car at this point, while patting it with his hand.

As if four asks were not enough, Officer McClendon then made his fifth and final request. He lied again, "I need to search your car . . . because I got the phone call [about] 10 kilos of cocaine."

Jamison would later explain that he was "tired of talking to [Officer McClendon]." Jamison kept telling the officer that there was nothing in the car, and the officer refused to listen.

Officer McClendon kept at it. He told Jamison that even if he found a "roach,"[30] he would ignore it and let Jamison go. The conversation became "heated." Jamison became frustrated and gave up. He told Officer McClendon, "As long as I can see what you're doing you can search the vehicle."

Officer McClendon remembers patting Jamison down after he exited the car. Both agree that Officer McClendon directed Jamison to stand in front of the patrol car, which allowed

---

[29] Officer McClendon denies saying such a thing.

[30] "A 'roach' is what remains after a joint, blunt, or marijuana cigarette has been smoked. It is akin to a cigarette butt." *United States v. Abernathy*, 843 F.3d 243, 247 n.1 (6th Cir. 2016) (citation omitted).

Jamison to see the search. As Jamison walked from his vehicle to the patrol car parked behind, he remembers asking Officer McClendon why he was stopped. Officer McClendon said it was because his license plate – a cardboard temporary tag from the car dealership – was "folded up." In his deposition, the Officer would later explain, "When you got these two bolts in and you're driving 65 miles an hour down the highway, it's going to flap up where you can't see it." Jamison testified, however, that it was not curled up and "had four screws in it."[31]

Officer McClendon later testified that he searched Jamison's car "from the engine compartment to the trunk to the undercarriage to underneath the engine to the back seats to anywhere to account for all the voids inside the vehicle."

As he started the search, NCIC dispatch called and flagged a discrepancy about whether Jamison's license was suspended. Officer McClendon told the dispatcher to search Jamison's driving history, which should have told them the status of Jamison's license. NCIC eventually discovered that Jamison's license was clear, although it is not apparent from the record when Officer McClendon heard back from the dispatcher.

According to Jamison, Officer McClendon continued speaking to Jamison during the search. He brought up "the 10 kilos of cocaine," asserted that the car was stolen, asked Jamison how many vehicles he owned, and claimed that Jamison did not have insurance on the car. Jamison kept saying that there was nothing in his car. At one point, Jamison heard a "pow"

---

[31] When Officer McClendon was shown the cardboard tag during his deposition, it showed no signs of being creased. The officer claimed that it either could have folded without creasing or that someone had ironed out the crease.

that "sounded like a rock" coming from inside the car, so he walked up to the car to see what had caused the noise. Officer McClendon told him to "Get back in front of my car." During the search, Jamison also requested to go to the bathroom several times, which Officer McClendon allowed.

Officer McClendon admitted in his deposition that he did not find "anything suspicious whatsoever." However, he asked Jamison if he could "deploy [his] canine." Jamison says he initially refused. Officer McClendon asked again, though, and Jamison relented, saying "Yes, go ahead." Officer McClendon "deployed [his] dog around the vehicle." The dog gave no indication, "so it confirmed that there was nothing inside the vehicle."

Before leaving, Officer McClendon asked Jamison to check his car to see if there was any damage. He gave Jamison a flashlight and told Jamison that he would pay for anything that was damaged. Jamison – who says he was tired – looked on the driver's side of the car and on the backseat, told Officer McClendon that he did not see anything, and returned the flashlight within a minute.

In total, the stop lasted one hour and 50 minutes.[32]

---

[32] This explains why he was tired. Here he was, standing on the side of a busy interstate at night for almost two hours against his will so Officer McClendon could satisfy his goal of searching Jamison's vehicle. In that amount of time, Dorothy and Toto could have made it up and down the yellow brick road and back to Kansas. *See* Lee Pfeiffer, *The Wizard of Oz*, ENCYCLOPEDIA BRITANNICA (Mar. 19, 2010) (noting the 101-minute run time of the 1939 film). If Jamison was driving at 70 MPH before being stopped, in the 110 minutes he was held on the side of the road he would have gotten another 128 miles closer to home, through Rankin, Scott, Newton, and Lauderdale counties and more than 40 miles into Alabama.

Jamison subsequently filed this lawsuit against Officer McClendon and the City of Pelahatchie, Mississippi. He raised three claims.

In "Claim 1," Jamison alleged that the defendants violated his Fourth Amendment rights by "falsely stopping him, searching his car, and detaining him." Jamison's second claim, brought under the Fourteenth Amendment, stated that the defendants should be held liable for using "race [as] a motivating factor in the decision to stop him, search his car, and detain him." Jamison's third claim alleged a violation of the Fourth Amendment by Officer McClendon for "recklessly and deliberately causing significant damage to Mr. Jamison's car by conducting an unlawful search of the car in an objectively unreasonable manner amounting to an unlawful seizure of his property."

Jamison sought actual, compensatory, and punitive damages against Officer McClendon. He testified that he received an estimate for almost $4,000 of physical damage to his car. He described the damage as requiring the replacement of the "whole top" of the car and re-stitching or replacement of his car seats. In his deposition, Jamison said he provided pictures and the estimates to Officer McClendon's counsel.

Jamison also sought damages for the psychological harm he sustained. During his deposition, he described the emotional toll of the traffic stop and search in this way:

> When I first got home, I couldn't sleep. So I was up for like – I didn't even sleep when I got home. I think I got some rest the next day because I was still mad just thinking about it and then when all this killing and stuff come on TV, that's like a flashback. I said, man, this could

> have went this way. It had me thinking all kind
> of stuff because it was not even called for. . . .
>
> Then I seen a story about the guy in South Car-
> olina, in Charleston, a busted taillight. They
> stopped him for that and shot him in the back,[33]
> and all that just went through my mind . . . .
>
> I don't even watch the news no more. I stopped
> watching the news because every time you turn
> it on something's bad.

On December 1, 2017, the defendants filed a motion for sum-
mary judgment. The motion said it would explain "why all
claims against all defendants should be dismissed as a matter

---

[33] Given the timeline – Jamison filed this suit in 2016 – he may be referring
to the 2015 killing of Walter Scott by former South Carolina policeman
Michael Slager. A bystander captured video of Slager shooting Scott in the
back as he ran away, leading to "protests across the U.S. as demonstrators
said it was another example of police officers mistreating Blacks." Meg
Kinnard, *South Carolina officer loses appeal over shooting conviction*, Assoc.
Press (Jan. 8, 2019). Another news source noted that Scott was shot in the
back five times. Meredith Edward & Dakin Andone, *Ex-South Carolina Cop
Michael Slager gets 20 years for Walter Scott Killing*, CNN (Dec. 7, 2017). "At
the time of the shooting, Scott was only the latest black man to be killed in
a series of controversial officer-involved shootings that prompted 'Black
Lives Matter' protests and vigils." *Id.* Slager pleaded guilty to federal crim-
inal charges that he deprived of Scott of his civil rights and was sentenced
to serve 20 years in prison. State murder charges were dropped. The fact
that Slager was convicted is an anomaly; law enforcement officers are
rarely charged for on-duty killings, let alone convicted. *See generally* Janell
Ross, *Police officers convicted for fatal shootings are the exception, not the rule*,
NBC News (Mar. 13, 2019); Jamiles Lartey et al., *Former officer Michael
Slager sentenced to 20 years for murder of Walter Scott*, The Guardian (Dec.
7, 2017).

of law." The motion, however, failed to provide an argument as to Jamison's third claim.

Prior to the completion of briefing on the motion, the parties agreed to dismiss the City of Pelahatchie from the case.

On September 26, 2018, the Court entered an order granting in part and deferring in part the motion for summary judgment.[34] The Court found that Officer McClendon had shown he was entitled to summary judgment as to Jamison's Fourteenth Amendment claim for a racially-motivated stop.[35] The Court also found that Officer McClendon was protected by qualified immunity as to Jamison's claims that Officer McClendon did not have reasonable suspicion to stop him. However, after a hearing, the Court requested supplemental briefing to "help . . . determine if McLendon is entitled to qualified immunity on Jamison's lack of consent and prolonged stop claims." The present motion followed.

## II.    Legal Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[36] A dispute is genuine "if the evidence supporting" the non-movant, "together with any inferences in such party's favor that the evidence allows, would be sufficient to support a verdict in

---

[34] Docket No. 62.

[35] Jamison provided no evidence of comparative discriminatory treatment of those among similarly-situated individuals of different classes. *See id* at 7–8.

[36] Fed. R. Civ. P. 56(a).

favor of that party."[37] A fact is material if it is one that might affect the outcome of the suit under the governing law.[38]

A party seeking to avoid summary judgment must identify admissible evidence in the record showing a fact dispute.[39] That evidence may include "depositions, . . . affidavits or declarations, . . . or other materials."[40]

When evaluating a motion for summary judgment, courts are required to view all evidence in the light most favorable to the non-moving party and must refrain from making credibility determinations.[41]

### III.    Historical Context

In accordance with Supreme Court precedent, we begin with a look at the "origins" of the relevant law.[42]

### A.    Section 1983: A New Hope

Jamison brings his claims under 42 U.S.C. § 1983, a statute that has its origins in the Civil War and "Reconstruction," the brief era that followed the bloodshed. If the Civil War was the only war in our nation's history dedicated to the proposition that Black lives matter, Reconstruction was dedicated to the proposition that Black futures matter, too. "Reconstruction was the

---

[37] *St. Amant v. Benoit*, 806 F.2d 1294, 1297 (5th Cir. 1987) (citation omitted).

[38] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[39] Fed. R. Civ. P. 56(c)(1).

[40] *Id.* at 56(c)(1)(A).

[41] *Strong v. Dep't of Army*, 414 F. Supp. 2d 625, 628 (S.D. Miss. 2005).

[42] *Ramos v. Louisiana*, 140 S. Ct. 1390, 1394 (2020).

essential sequel to the Civil War, completing its mission."[43] During Reconstruction, the abolitionists and soldiers who fought for emancipation sought no less than "the reinvention of the republic and the liberation of blacks to citizenship and Constitutional equality."[44]

The Reconstruction-era Congress passed "legislation to protect the freedoms granted to those who were recently enslaved."[45] One such piece of legislation created the Freedman's Bureau, a War Department agency that educated the formerly enslaved, provided them with legal protection, and "relocate[ed] them on more than 850,000 acres of land the federal government came to control during the war."[46] Another successful legislative effort was the passage of the Thirteenth, Fourteenth, and Fifteenth Amendments, also known as the "Reconstruction Amendments."[47]

---

[43] RON CHERNOW, GRANT 706 (2017); *see also* Stephen Cresswell, *Enforcing the Enforcement Acts: The Department of Justice in Northern Mississippi 1870-1890*, 53 J. S. HIST. 421, 421 (Aug. 1987), http://www.jstor.org/stable/2209362 (describing the era as Mississippi's first civil rights struggle and noting that the federal government sought to "secure black civil and political equality in the years after the Civil War.").

[44] DAVID W. BLIGHT, RACE AND REUNION: THE CIVIL WAR IN AMERICAN MEMORY 2 (2001).

[45] Katherine A. Macfarlane, *Accelerated Civil Rights Settlements in the Shadow of Section 1983*, 2018 UTAH L. REV. 639, 660 (2018) (citation omitted); *see* BLIGHT, *supra* at 47.

[46] CHERNOW, *supra* at 562.

[47] *United States v. Cannon*, 750 F.3d 492, 509 (5th Cir. 2014) (Elrod, J., concurring).

The Thirteenth Amendment "represented the Union's deep seated commitment to end the 'badges and incidents of servitude,' [and] was an unadulterated call to abandon injustices that had made blacks outsiders in the country they helped build and whose economy they helped sustain."[48] The Fourteenth Amendment reversed *Dred Scott v. Sanford*.[49] While the amendment was "unpassable as a specific protection for black rights,"[50] it made all persons born in the United States citizens of this country and guaranteed due process and equal protection of the law. "The main object of the amendment was to enforce absolute equality of the races."[51] President Grant called the Fifteenth Amendment "the most important event that has occurred[] since the nation came into life . . . the realization of the Declaration of Independence."[52] "Each Amendment authorized Congress to pass appropriate legislation to enforce it."[53] Taken together, "Reconstruction would mark a revolutionary change in the federal system, with the national

---

[48] Alexander Tsesis, *The Problem of Confederate Symbols: A Thirteenth Amendment Approach*, 75 TEMP. L. REV. 539, 542 (2002) (quotations and citation omitted).

[49] 60 U.S. 393 (1857).

[50] DERRICK A. BELL, JR., RACE, RACISM, AND AMERICAN LAW 47 (6th ed. 2008).

[51] Margaret Bush Wilson and Diane Ridley, *The New Birth of Liberty: The Role of Thurgood Marshall's Civil Rights Contribution*, 6 NAT'L BLACK L.J. 67, 75 n.26 (1978)

[52] CHERNOW, *supra* at 685–86.

[53] THE OXFORD GUIDE TO THE SUPREME COURT OF THE UNITED STATES 442 (Kermit L. Hall et al. eds., 2d ed. 2005).

government passing laws forcing the states to fulfill their constitutional responsibilities."[54]

For the first time in its history, the United States saw a Black man selected to serve in the United States Senate (two from Mississippi, in fact – Hiram Revels and Blanche K. Bruce),[55] the establishment of public school systems across the South,[56] and increased efforts to pass local anti-discrimination laws.[57] It was a glimpse of a different America.

These "emancipationist" efforts existed alongside white supremacist backlash, terror, and violence.[58] "In Mississippi, it

---

[54] *Id.*

[55] ERIC FONER, RECONSTRUCTION: AMERICA'S UNFINISHED REVOLUTION 1863-1877 353–57 (1988). Black Mississippians were also elected to local, state, and federal posts. John R. Lynch, a former slave, would serve as Speaker of the House in the Mississippi Legislature and would later represent Mississippi in Congress. *See* JOHN R. LYNCH, REMINISCENCES OF AN ACTIVE LIFE: THE AUTOBIOGRAPHY OF JOHN ROY LYNCH xii–xv (1970). James Hill, also formerly enslaved, would too serve as Speaker of the House and was later elected as Mississippi's Secretary of State. *See* GEORGE A. SEWELL & MARGARET L. DWIGHT, MISSISSIPPI BLACK HISTORY MAKERS 48 (2d ed. 1984).

[56] FONER, *supra* at 365–67. During this period, Mississippi's Superintendent of Education was Thomas Cardozo, a Black man. *See History*, THOMAS CARDOZO MIDDLE SCHOOL, https://www.jackson.k12.ms.us/domain/616 (last visited July 10, 2020).

[57] FONER, *supra* at 368–71.

[58] The chasm between these two visions of America was embodied by President Johnson, who in his official capacity led a nation founded in the belief "that all men are created equal," yet in his individual capacity "side[d] with white supremacists," "privately referred to blacks as 'nig-

18

became a criminal offense for blacks to hunt or fish,"[59] and a U.S. Army General reported that "white militias, with telltale names such as the Jeff Davis Guards, were springing up across" the state.[60] In Shreveport, Louisiana, more than 2,000 black people were killed in 1865 alone.[61] "In 1866, there were riots in Memphis and New Orleans; more than 30 African-Americans were murdered in each melee."[62]

"The Ku Klux Klan, formed in 1866 by six white men in a Pulaski, Tennessee law office, 'engaged in extreme violence against freed slaves and Republicans,' assaulting and murdering its victims and destroying their property."[63] The Klan "spread rapidly across the South" in 1868,[64] orchestrating a "huge wave of murder and arson" to discourage Blacks from voting.[65] "[B]lack schools and churches were burned with impunity in North Carolina, Mississippi, and Alabama."[66]

The terrorism in Mississippi was unparalleled. During the first three months of 1870, 63 Black Mississippians "were

---

gers,'" and had "a morbid fascination with miscegenation." CHERNOW, *supra* at 550; *see generally* FONER, *supra* at 412–59; NICHOLAS LEMANN, REDEMPTION: THE LAST BATTLE OF THE CIVIL WAR (2006).

[59] CHERNOW, *supra* at 563.

[60] *Id.*

[61] *Id.* at 568.

[62] *See, well, Moore v. Bryant*, 205 F. Supp. 3d 834, 840 (S.D. Miss. 2016) (citation omitted).

[63] Macfarlane, *supra* at 660.

[64] CHERNOW, *supra* at 588.

[65] *Id.* at 621.

[66] *Id.* at 571, 703.

murdered . . . and nobody served a day for these crimes."[67] In 1872, the U.S. Attorney for Mississippi wrote that Klan violence was ubiquitous and that "only the presence of the army kept the Klan from overrunning north Mississippi completely."[68]

Many of the perpetrators of racial terror were members of law enforcement.[69] It was a twisted law enforcement, though, as it prevented the laws of the era from being enforced.[70] When the Klan murdered five witnesses in a pending case, one of Mississippi's District Attorneys complained, "I cannot get witnesses as all feel it is sure death to testify."[71] White suprema-

---

[67] *Id.* at 703.

[68] Cresswell, *supra* at 426.

[69] *See* Robin D. Barnes, *Blue by Day and White by (k)night: Regulating the Political Affiliations of Law Enforcement and Military Personnel*, 81 Iowa L. Rev. 1079, 1099 (1996); Randolph M. Scott-McLaughlin, *Bray v. Alexandria Women's Health Clinic: The Supreme Court's Next Opportunity to Unsettle Civil Rights Law*, 66 Tul. L. Rev. 1357, 1371 (1992); Alfred L. Brophy, *Norms, Law, and Reparations: The Case of the Ku Klux Klan in 1920s Oklahoma*, 20 Harv. BlackLetter L.J. 17, 24–25 (2004); *see also* Sherrilyn A. Ifill, On the Courthouse Lawn: Confronting the Legacy of Lynching in the 21st Century 77–84 (2007); Foner, *supra* at 434 ("Much Klan activity took place in those Democratic counties where local officials either belonged to the organization or refused to take action against it.").

[70] *See* Barnes, *supra* at 1094.

[71] Chernow, *supra* at 702; *see also* Cresswell, *supra* at 432 ("Attorneys, marshals, witnesses and jurors suffered abuse and assault, were ostracized by the white community, and some were even murdered.").

cists and the Klan "threatened to unravel everything . . . Union soldiers had accomplished at great cost in blood and treasure."[72]

Professor Leon Litwack described the state of affairs in stark words:

> How many black men and women were beaten, flogged, mutilated, and murdered in the first years of emancipation will never be known.[73] Nor could any accurate body count or statistical breakdown reveal the barbaric savagery and depravity that so frequently characterized the assaults made on freedmen in the name of restraining their savagery and depravity – the severed ears and entrails, the mutilated sex organs, the burnings at the stake, the forced drownings, the open display of skulls and severed limbs as trophies.[74]

"Congress sought to respond to 'the reign of terror imposed by the Klan upon black citizens and their white sympathizers in the Southern States.'"[75] It passed The Ku Klux Act of 1871,

---

[72] CHERNOW, *supra* at 707.

[73] At least 2,000 Black women, men, and children were killed by white mobs in racial terror lynchings during Reconstruction. *See Reconstruction in America*, EQUAL JUST. INITIATIVE, https://eji.org/report/reconstruction-in-america/ (last visited July 16, 2020). "Thousands more were assaulted, raped, or injured in racial terror attacks between 1865 and 1877." *Id.*

[74] LEON F. LITWACK, BEEN IN THE STORM SO LONG: THE AFTERMATH OF SLAVERY 276–77 (1979).

[75] *Baxter v. Bracey*, 140 S. Ct. 1862 (2020) (Thomas, J., dissenting from the denial of certiorari) (quoting *Briscoe v. LaHue*, 460 U.S. 325, 337 (1983)).

which "targeted the racial violence in the South undertaken by the Klan, and the failure of the states to cope with that violence."[76]

The Act's mandate was expansive. Section 2 of the Act provided for civil and criminal sanctions against those who conspired to deprive people of the "equal protection of the laws."[77] "Sections 3 and 4 authorized the use of federal force to redress a state's inability or unwillingness to deal with Klan or other violence."[78] "The Act was strong medicine."[79]

Section 1 of the Ku Klux Act, now codified as 42 U.S.C. § 1983, uniquely targeted state officials who "deprived persons of their constitutional rights."[80] While the Act as a whole "had the Klan 'particularly in mind,'" Section 1 recognized the local officials who created "the lawless conditions" that plagued "the South in 1871."[81] Thus, the doors to the courthouse were opened to "any person who ha[d] been deprived of her federally protected rights by a defendant acting under color of state

---

[76] Macfarlane, *supra* at 661 (quotations and citations omitted); *see also Monroe v. Pape*, 365 U.S. 167, 172–83 (1961), *overruled on other grounds by Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978).

[77] Theodore Eisenberg, *Section 1983: Doctrinal Foundations and an Empirical Study*, 67 CORNELL L. REV. 482, 485 (1982) (citations omitted).

[78] *Id.*

[79] *Id.*

[80] *Id.*

[81] *Monroe*, 365 U.S. at 174.

22

law."[82] The Act reflected Congress's recognition that – to borrow the words of today's abolitionists – "the whole damn system [was] guilty as hell."[83]

Some parts of the Act were fairly successful. Led by federal prosecutors at the Department of Justice, "federal grand juries, many interracial, brought 3,384 indictments against the KKK, resulting in 1,143 convictions."[84] One of Mississippi's U.S. Senators reported that the Klan largely "suspended their operations" in most of the State.[85] Frederick Douglass proclaimed that "peace has come to many places," and the "slaughter of our people have so far ceased."[86]

Douglass had spoken too soon. "By 1873, many white Southerners were calling for 'Redemption' – the return of white supremacy and the removal of rights for blacks – instead of Reconstruction."[87] The federal system largely abandoned the emancipationist efforts of the Reconstruction Era.[88] And the violence returned. "In 1874, 29 African-Americans were massacred in Vicksburg, according to Congressional investigators. The next year, amidst rumors of an African-American

---

[82] Zach Lass, *Lowe v. Raemisch: Lowering the Bar of the Qualified Immunity Defense*, 96 Denv. L. Rev. 177, 180 (2018) (citation omitted).

[83] @ignitekindred, Twitter (Apr. 25, 2016, 6:39 PM) https://twitter.com/ignitekindred/status/724744680878039040.

[84] Chernow, *supra* at 708.

[85] *Id.* at 710.

[86] *Id.* at 709.

[87] *Reconstruction vs. Redemption*, Nat'l Endowment Human. (Feb. 11, 2014); *see also* Blight, *supra* at 101–02.

[88] Blight, *supra* at 137–39.

plot to storm the town, the Mayor of Clinton, Mississippi gathered a white paramilitary unit which hunted and killed an estimated 30 to 50 African-Americans."[89] And in 1876, U.S. Marshal James Pierce said, "Almost the entire white population of Mississippi is one vast mob."[90]

Federal courts joined the retreat and decided to place their hand on the scale for white supremacy.[91] As Katherine A. Macfarlane writes:

> In several decisions, beginning with 1873's *Slaughter-House Cases*, the Supreme Court limited the reach of the Fourteenth Amendment and the statutes passed pursuant to the power it granted Congress. By 1882, the Court had voided the Ku Klux Act's criminal conspiracy section, a provision "aimed at lynchings and other mob actions of an individual or private nature."

---

[89] *Moore*, 205 F. Supp. 3d at 840 (quotations, citations, and brackets omitted).

[90] Cresswell, *supra* at 429.

[91] That is not surprising since many of these judges were members of the Klan, supporters of the Confederacy, or both. *See Barnes*, *supra* at 1099 ("judges, politicians, and law enforcement officers were fellow Klansmen"); PETER CHARLES HOFFER ET AL., THE FEDERAL COURTS: AN ESSENTIAL HISTORY 193 (2016) ("a near majority" of Article III judges appointed in the wake of Reconstruction were former Confederates). L.Q.C. Lamar, the only Mississippian to ever serve on the Supreme Court, was on the side of these renegades. *See generally* DENNIS J. MITCHELL, A NEW HISTORY OF MISSISSIPPI 199–200 (2014). As an attorney, Lamar was noted for "wielding a chair" in open court and attacking a U.S. Marshal, "breaking a small bone at the cap of the [Marshal's] eye." Cresswell, *supra* at 434.

> As a result of the Court's narrowed construction of both the Fourteenth Amendment and the civil rights statutes enacted pursuant to it, the Ku Klux Act's "scope and effectiveness" shrunk. The Court never directly addressed Section 1 of the Act, but those sections of the Act [were] left "largely forgotten."[92]

For almost a century, Redemption prevailed. "Lynchings, race riots and other forms of unequal treatment were permitted to abound in the South and elsewhere without power in the federal government to intercede."[93] Jim Crow ruled, and Jim Crow meant that "[a]ny breach of the system could mean one's life."[94] While Reconstruction "saw the basic rights of blacks to citizenship established in law," our country failed "to ensure their political and economic rights."[95] Our courts' "involvement in that downfall and its consequences could not have been greater."[96]

Though civil rights protection was largely abandoned at the federal level, activists continued to fight to realize the broken promise of Reconstruction. The Afro-American League, the Niagara Movement, the National Negro Conference (later renamed the NAACP) and other civil rights groups formed to

---

[92] Macfarlane, *supra* at 661–62 (citations omitted).

[93] *Id.* at 662.

[94] *Id.*

[95] BELL, *supra* at 48.

[96] *Id.* at 49.

challenge lynching and the many oppressive laws and practices of discrimination.[97] One group's efforts – the Citizens' Committee – led to a lawsuit designed to create an Equal Protection Clause challenge to Louisiana's segregationist laws on railroad cars. Unfortunately, the ensuing case, *Plessy v. Ferguson,* resulted in the Supreme Court's decision to affirm the racist system of "separate but equal" accommodations.[98] Despite this setback, civil rights activism continued, intensifying after the Supreme Court's *Brown v. Board* decision and resulting in many of the civil rights laws we have today.[99]

It was against this backdrop that the Supreme Court attempted to resuscitate Section 1983.[100] In 1961, the Court decided *Monroe v. Pape,* a case where "13 Chicago police officers broke into [a Black family's] home in the early morning, routed them from bed, made them stand naked in the living room, and ransacked every room, emptying drawers and ripping mattress covers."[101] The Justices held that Section 1983 provides a remedy for people deprived of their constitutional rights by state officials.[102] Accordingly, the Court found that

---

[97] Macfarlane, *supra* at 663.

[98] 163 U.S. 537, 552 (1896) (Harlan, J., dissenting), *overruled on other grounds by Brown v. Bd. of Ed. of Topeka*, 347 U.S. 483 (1954).

[99] *See generally* Macfarlane, *supra* at 665.

[100] Sheldon Nahmod, *Section 1983 Discourse: The Move from Constitution to Tort*, 77 Geo. L.J. 1719, 1722 (1989).

[101] 365 U.S. at 169.

[102] *Id.* at 187.

the Monroe family could pursue their lawsuit against the officers.[103]

Section 1983's purpose was finally realized, namely "'to interpose the federal courts between the States and the people, as guardians of the people's federal rights.'"[104] The statute has since become a powerful "vehicle used by private parties to vindicate their constitutional rights against state and local government officials."[105]

Section 1983 provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .[106]

Invoking this statute, Jamison contends that Officer McClendon violated his Fourth Amendment right to be free from unreasonable searches and seizures.

---

[103] *Id.*

[104] *Haywood v. Drown*, 556 U.S. 729, 735 (2009) (quoting *Mitchum v. Foster*, 407 U.S. 225, 242 (1972)).

[105] Jack M. Beermann, *The Unhappy History of Civil Rights Legislation, Fifty Years Later*, 34 Conn. L. Rev. 981, 1002 (2002).

[106] 42 U.S.C. § 1983.

### B.      Qualified Immunity: The Empire Strikes Back

Just as the 19th century Supreme Court neutered the Recon-
struction-era civil rights laws, the 20th century Court limited
the scope and effectiveness of Section 1983 after *Monroe v.
Pape*.[107]

The doctrine of qualified immunity is perhaps the most im-
portant limitation.

Although Section 1983 made no "mention of defenses or im-
munities, '[the Supreme Court] read it in harmony with gen-
eral principles of tort immunities and defenses rather than in
derogation of them.'"[108] It reasoned that "[c]ertain immunities
were so well established in 1871[109] . . . that 'we presume that
Congress would have specifically so provided had it wished
to abolish' them."[110]

On that presumption the doctrine of qualified immunity was
born, with roots right here in Mississippi. In *Pierson v. Ray*,
"15 white and Negro Episcopal clergymen . . . attempted to

---

[107] *See* John Valery White, *The Activist Insecurity and the Demise of Civil
Rights Law*, 63 LA. L. REV. 785, 803 (2003) (noting that we "have witnessed
the restriction of rights developed during" the Civil Rights Movement, in-
cluding Section 1983).

[108] *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1870 (2017) (Thomas, J., concurring)
(quoting *Malley v. Briggs*, 475 U.S. 335, 339 (1986)).

[109] Several scholars have shown that history does not support the Court's
claims about qualified immunity's common law foundations. *See, e.g.*, Jo-
anna C. Schwartz, *The Case Against Qualified Immunity*, 93 NOTRE DAME L.
REV. 1797, 1801 (2018) [hereinafter *The Case Against Qualified Immunity*].

[110] *Ziglar*, 137 S. Ct. at 1870 (citations omitted).

use segregated facilities at an interstate bus terminal in Jackson, Mississippi, in 1961."[111] The clergymen were arrested and charged with violation of a Mississippi statute – later held unconstitutional – that made it a misdemeanor "to congregate[] with others in a public place under circumstances such that a breach of the peace" may occur and to "refuse[] to move on when ordered to do so by a police officer."[112] The clergymen sued under Section 1983. In their defense, the officers argued that "they should not be liable if they acted in good faith and with probable cause in making an arrest under a statute that they believed to be valid."[113]

The Supreme Court agreed. It held that officers should be shielded from liability when acting in good faith – at least in the context of constitutional violations that mirrored the common law tort of false arrest and imprisonment.[114]

Subsequent decisions "expanded the policy goals animating qualified immunity."[115] The Supreme Court eventually characterized the doctrine as an "attempt to balance competing values: not only the importance of a damages remedy to protect the rights of citizens, but also the need to protect officials who are required to exercise discretion and the related public

---

[111] 386 U.S. 547, 549 (1967).

[112] *Id.*

[113] *Id.* at 555.

[114] *Id.* ("A policeman's lot is not so unhappy that he must choose between being charged with dereliction of duty if he does not arrest when he has probable cause, and being mulcted in damages if he does.").

[115] Joanna C. Schwartz, *How Qualified Immunity Fails*, 127 YALE L.J. 2, 14 (2017) (citations omitted).

interest in encouraging the vigorous exercise of official authority."[116]

A review of our qualified immunity precedent makes clear that the Court has dispensed with any pretense of balancing competing values. Our courts have shielded a police officer who shot a child while the officer was attempting to shoot the family dog;[117] prison guards who forced a prisoner to sleep in cells "covered in feces" for days;[118] police officers who stole over $225,000 worth of property;[119] a deputy who body-slammed a woman after she simply "ignored [the deputy's] command and walked away";[120] an officer who seriously burned a woman after detonating a "flashbang" device in the bedroom where she was sleeping;[121] an officer who deployed a dog against a suspect who "claim[ed] that he surrendered by raising his hands in the air";[122] and an officer who shot an

---

[116] *Harlow v. Fitzgerald*, 457 U.S. 800, 800 (1982).

[117] *Corbitt v. Vickers*, 929 F.3d 1304, 1323 (11th Cir. 2019), *cert. denied*, No. 19-679, 2020 WL 3146693 (U.S. June 15, 2020).

[118] *Taylor v. Stevens*, 946 F.3d 211, 220 (5th Cir. 2019).

[119] *Jessop v. City of Fresno*, 936 F.3d 937, 942 (9th Cir. 2019), *cert. denied* No. 19-1021, 2020 WL 2515813 (U.S. May 18, 2020).

[120] *Kelsay v. Ernst*, 933 F.3d 975, 980 (8th Cir. 2019), *cert. denied*, No. 19-682, 2020 WL 2515455 (U.S. May 18, 2020).

[121] *Dukes v. Deaton*, 852 F.3d 1035, 1039 (11th Cir. 2017).

[122] *Baxter v. Bracey*, 751 F. App'x 869, 872 (6th Cir. 2018), *cert. denied*, 140 S. Ct. 1862 (2020).

unarmed woman eight times after she threw a knife and glass at a police dog that was attacking her brother.[123]

If Section 1983 was created to make the courts "guardians of the people's federal rights,'" what kind of guardians have the courts become? [124] One only has to look at the evolution of the doctrine to answer that question.

Once, qualified immunity protected officers who acted in good faith. The doctrine now protects all officers, no matter how egregious their conduct, if the law they broke was not "clearly established."

This "clearly established" requirement is not in the Constitution or a federal statute. The Supreme Court came up with it in 1982.[125] In 1986, the Court then "evolved" the qualified immunity defense to spread its blessings "to all but the plainly incompetent or those who knowingly violate the law."[126] It further ratcheted up the standard in 2011, when it added the

---

[123] *Willingham v. Loughnan*, 261 F.3d 1178, 1181 (11th Cir. 2001), *cert. granted, judgment vacated*, 537 U.S. 801 (2002).

[124] *Haywood*, 556 U.S. at 735 (citation omitted).

[125] *See Harlow*, 457 U.S. at 818; *see also* William Baude, *Is Qualified Immunity Unlawful?*, 106 CAL. L. REV. 45, 81 (2018). Previously, the Court had used "clearly established" as an explanatory phrase to better understand good faith. *See, e.g., Wood v. Strickland*, 420 U.S. 308, 322 (1975) (finding compensatory damages "appropriate only if the school board member has acted with such an impermissible motivation or with such disregard of the student's clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith.").

[126] *Malley*, 475 U.S. at 341; *see also* Pamela S. Karlan, *Foreword: Democracy and Disdain*, 126 HARV. L. REV. 1, 61 (2012). *Malley* was also the first time "objectively unreasonable" appeared in a Supreme Court qualified immunity decision.

words *beyond debate.*[127] In other words, "for the law to be clearly established, it must have been 'beyond debate' that [the officer] broke the law."[128] An officer cannot be held liable unless *every* reasonable officer would understand that what he is doing violates the law.[129] It does not matter, as the Fifth Circuit has explained, "that we are morally outraged, or the fact that our collective conscience is shocked by the alleged conduct . . . [because it] does not mean necessarily that the officials should have realized that [the conduct] violated a

---

[127] *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (citations omitted) (emphasis added).

[128] *McCoy v. Alamu*, 950 F.3d 226, 233 (5th Cir. 2020) (citation omitted). That leads us to another rabbit hole. A district court opinion doesn't clearly establish the law in a jurisdiction. *Id*. at 233 n.6 (citation omitted). Nor does a circuit court opinion, if the judges designate it as "unpublished." *Id*. Only *published* circuit court decisions count. *See id*. Even then, the Supreme Court has "expressed uncertainty" about whether courts of appeals may ever deem constitutional law clearly established. *Cole*, 935 F.3d at 460 n.4 (Jones, J., dissenting) (collecting cases).

[129] *al-Kidd*, 563 U.S. at 741. As Professor John Jeffries explains, "[t]he narrower the category of cases that count, the harder it is to find a clearly established right." John C. Jeffries, Jr., *What's Wrong with Qualified Immunity?*, 62 FLA. L. REV. 851, 859 (2010) [hereinafter *What's Wrong with Qualified Immunity?*]. This restrictive approach bulks up qualified immunity and makes its protections difficult to penetrate. When combining the narrow view of relevant precedent to the demand for "extreme factual specificity in the guidance those precedents must provide, the search for 'clearly established' law becomes increasingly unlikely to succeed, and 'qualified' immunity becomes nearly absolute." *Id*.

constitutional right."[130] Even evidence that the officer acted in bad faith is now considered irrelevant.[131]

The Supreme Court has also given qualified immunity sweeping procedural advantages. "Because the defense of qualified immunity is, in part, a question of law, it naturally creates a 'super-summary judgment' right on behalf of government officials. Even when an official is not entitled to summary judgment on the merits – because the plaintiff has stated a proper claim and genuine issues of fact exist – summary judgment can still be granted when the law is not reasonably clear."[132]

And there is more. The Supreme Court says defendants should be dismissed at the "earliest possible stage" in the proceedings to not be burdened with the matter.[133] The earliest possible stage may include a stage in the case before any discovery has been taken and necessarily before a plaintiff has obtained all the relevant facts and all (or any) documents.[134] If a court denies a defendant's motion seeking dismissal or summary judgment based on qualified immunity, that decision is

---

[130] *Foster v. City of Lake Jackson*, 28 F.3d 425, 430 (5th Cir. 1994) (quotations and citation omitted).

[131] *See Mullenix v. Luna*, 136 S. Ct. 305, 316 (2015) (Sotomayor, J., dissenting) ("an officer's actual intentions are irrelevant to the Fourth Amendment's 'objectively reasonable' inquiry") (citing *Graham v. Connor*, 490 U.S. 396, 397 (1989)).

[132] Mark R. Brown, *The Fall and Rise of Qualified Immunity: From Hope to Harris*, 9 Nev. L.J. 185, 195 (2008).

[133] *Saucier v. Katz*, 533 U.S. 194, 200–01 (2001).

[134] *See Bosarge v. Mississippi Bureau of Narcotics*, 796 F.3d 435, 443 (5th Cir. 2015) (citation omitted) ("[o]ne of the most salient benefits of qualified immunity is protection from pretrial discovery, which is costly, time-consuming and intrusive."); *see also* Lass, *supra*, at 188.

also immediately appealable.[135] Those appeals can lead all the way to the United States Supreme Court even before any trial judge or jury hears the merits of the case. Qualified immunity's premier advantage thus lies in the fact that it affords government officials review by (at least) four federal judges before trial.[136]

Each step the Court has taken toward absolute immunity heralded a retreat from its earlier pronouncements. Although the Court held in 2002 that qualified immunity could be denied "in novel factual circumstances,"[137] the Court's track record in the intervening two decades renders naïve any judges who believe that pronouncement.[138]

Federal judges now spend an inordinate amount of time trying to discern whether the law was clearly established "beyond debate" at the time an officer broke it. But it is a fool's errand to ask people who love to debate whether something is debatable.

---

[135] *See Elder v. Holloway*, 510 U.S. 510, 516 (1994).

[136] Brown, *supra* at 196.

[137] *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

[138] *See generally Baude, supra* at 83 ("[A]ll but two of the [Supreme] Court's awards of qualified immunity reversed the lower court's denial of immunity below. In other words, lower courts that follow Supreme Court doctrine should get the message: think twice before allowing a government official to be sued for unconstitutional conduct."); *see also Mullenix*, 136 S. Ct. at 310 (reversing and reminding lower courts that the Supreme Court "has thus never found the use of deadly force in connection with a dangerous car chase to violate the Fourth Amendment, let alone to be a basis for denying qualified immunity"); *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam) (reversing and chastising the appellate court for "misunderst[anding] the 'clearly established' analysis").

Consider *McCoy v. Alamu*, a 2020 case in which a correctional officer violated a prisoner's Constitutional rights when he sprayed a chemical agent in the prisoner's face, without provocation.[139]

The Fifth Circuit then asked if the illegality of the use of force was clearly established beyond debate. The *prison* didn't think the use of force was debatable: it found the spraying unnecessary and against its rules. It put the officer on three months' probation.[140] Yet the appellate court disregarded the warden's judgment and held for the officer. The case involved only a "single use of pepper spray," after all, and the officer hadn't used "the full can."[141] Based on these factual distinctions, the court concluded that "the spraying crossed that line. But it was not *beyond debate* that it did, so the law wasn't clearly established."[142]

These kinds of decisions are increasingly common. Consider another Fifth Circuit case, this time from 2019, in which Texas prisoner Trent Taylor claimed that the conditions of his prison cells violated the Constitutional minimum:

> Taylor stayed in the first cell starting September 6, 2013. He alleged that almost the entire surface—including the floor, ceiling, window, walls, and water faucet—was covered with "massive amounts" of feces that emitted a

---

[139] 950 F.3d at 231.

[140] *Id.*

[141] *Id.* at 233.

[142] *Id.* A dissent argued that the majority was stretching qualified immunity to rule for the officer, since it was already clearly established that correctional officers couldn't use their fists, a baton, or a taser to assault an inmate without provocation. *Id.* at 234–35 (Costa, J., dissenting).

"strong fecal odor." Taylor had to stay in the cell naked. He said that he couldn't eat in the cell, because he feared contamination. And he couldn't drink water, because feces were "packed inside the water faucet." Taylor stated that the prison officials were aware that the cell was covered in feces, but instead of cleaning it, [Officers] Cortez, Davison, and Hunter laughed at Taylor and remarked that he was "going to have a long weekend." [Officer] Swaney criticized Taylor for complaining, stating "dude, this is Montford, there is shit in all these cells from years of psych patients." On September 10, Taylor left the cell.

A day later, September 11, Taylor was moved to a "seclusion cell," but its conditions were no better. It didn't have a toilet, water fountain, or bunk. There was a drain in the floor where Taylor was ordered to urinate. The cell was extremely cold because the air conditioning was always on. And the cell was anything but clean.

Taylor alleged that the floor drain was clogged, leaving raw sewage on the floor. The drain smelled strongly of ammonia, which made it hard for Taylor to breathe. Yet, he alleged, the defendants repeatedly told him that if he needed to urinate, he had to do so in the clogged drain instead of being escorted to the restroom. Taylor refused. He worried that, because the drain was clogged, his urine would spill onto the already-soiled floor, where he had to sleep because he lacked a bed. So, he held his urine

for twenty-four hours before involuntarily uri-
nating on himself. He stayed in the seclusion
cell until September 13. Prison officials then
tried to return him to his first, feces-covered cell,
but he objected and was permitted to stay in a
different cell.[143]

Taylor spent a total of six days in feces-covered cells.[144] To
make matters worse, the trial court found that Taylor "was
not allowed clothing and forced to endure the cold tempera-
tures with nothing but a suicide blanket."[145]

The correctional officers didn't submit much to contradict
Taylor's evidence of filth.[146] Yet they were granted qualified
immunity because it "wasn't clearly established" that "only
six days" of living in a cesspool of human waste was uncon-
stitutional.[147] The Fifth Circuit reasoned, "[t]hough the law
was clear that prisoners couldn't be housed in cells teeming
with human waste for months on end, we hadn't previously
held that a time period so short violated the Constitution. . . .

---

[143] *Taylor*, 946 F.3d at 218–19 (brackets and footnotes omitted).

[144] *Id.* at 218 & n.6.

[145] *Taylor v. Williams*, No. 5:14-CV-149-BG, 2016 WL 8674566, at *3 (N.D.
Tex. Jan. 22, 2016), *report and recommendation adopted*, No. 5:14-CV-149-C,
2016 WL 1271054 (N.D. Tex. Mar. 29, 2016), *aff'd in part, vacated in part,
remanded*, 715 F. App'x 332 (5th Cir. 2017).

[146] *Taylor*, 946 F.3d at 219.

[147] *Id.* at 222.

It was therefore not 'beyond debate' that the defendants broke the law."[148]

Never mind the 50 years of caselaw holding that "[c]ausing a man to live, eat and perhaps sleep in close confines with his own human waste is too debasing and degrading to be permitted."[149] Never mind the numerous[150] Fifth[151] Circuit[152] decisions[153] concluding that prisoners who live in "filthy, sometimes feces-smeared, cells" can bring a Constitutional claim.[154] Never mind that in other states, it is clearly established that

---

[148] *Id.* (citations omitted). It would appear that correctional officers in this Circuit can now just put inmates in feces-covered cells for *five* days or less and escape liability.

[149] *LaReau v. MacDougall*, 473 F.2d 974, 978 (2d Cir. 1972).

[150] *Bienvenu v. Beauregard Par. Police Jury*, 705 F.2d 1457, 1460 (5th Cir. 1983) ("Bienvenu's statements that the defendant . . . intentionally subjected him to a cold, rainy, roach-infested facility and furnished him with inoperative, scum-encrusted washing and toilet facilities sufficiently alleges a cause of action cognizable under 42 U.S.C. § 1983.")

[151] *Palmer v. Johnson*, 193 F.3d 346, 352 (5th Cir. 1999) (concluding that plaintiff stated a Constitutional claim when "his only option was to urinate and defecate in the confined area that he shared with forty-eight other inmates").

[152] *Gates v. Cook*, 376 F.3d 323, 338 (5th Cir. 2004) (affirming injunction where "cells were 'extremely filthy' with crusted fecal matter, urine, dried ejaculate, peeling and chipping paint, and old food particles").

[153] *Cowan v. Scott*, 31 F. App'x 832, at *2 (5th Cir. 2002) (finding that prisoner stated a Constitutional claim when he alleged that "he was forced to lie in feces for days without access to a shower").

[154] *Harper v. Showers*, 174 F.3d 716, 717 (5th Cir. 1999).

only *three* days of living in feces-covered cells is unconstitutional.[155] And never mind that the Supreme Court had acknowledged warmth as an "identifiable human need" and that "a low cell temperature at night combined with a failure to issue [a] blanket[]" may deprive an inmate of such.[156] None of that mattered after 2011, the year the Supreme Court ratchetted up the standard to require that the unlawfulness be "beyond debate."[157]

Fifth Circuit Judge Don Willett has succinctly explained the problem with the clearly established analysis:

> Section 1983 meets Catch-22. Plaintiffs must produce precedent even as fewer courts are producing precedent. Important constitutional questions go unanswered precisely because no one's answered them before. Courts then rely on that judicial silence to conclude there's no

---

[155] *See, e.g., McBride v. Deer*, 240 F.3d 1287, 1291 (10th Cir. 2001); *Sperow v. Melvin*, 182 F.3d 922 (7th Cir. 1999); *see also Fruit v. Norris*, 905 F.2d 1147, 1151 (8th Cir. 1990) (holding that "forcing inmates to work in a shower of human excrement without protective clothing and equipment" for as little as 10 minutes stated a claim). Judge Wilson of the Eleventh Circuit once wrote that "there is remarkably little consensus among the United States circuit courts concerning how to interpret the term 'clearly established.'" Charles R. Wilson, *"Location, Location, Location": Recent Developments in the Qualified Immunity Defense*, 57 N.Y.U. Ann. Surv. Am. L. 445, 447 (2000). "One has to work hard to find some doctrinal consistency or predictability in the case law and the circuits are hopelessly conflicted both within and among themselves." Karen M. Blum, *Section 1983 Litigation: The Maze, the Mud, and the Madness*, 23 Wm. & Mary Bill Rts. J. 913, 925 (2015) (collecting cases).

[156] *Wilson v. Seiter*, 501 U.S. 294, 304 (1991).

[157] *al-Kidd*, 563 U.S. at 741.

> equivalent case on the books. No precedent = no clearly established law = no liability. An Escherian Stairwell. Heads government wins, tails plaintiff loses.[158]

To be clear, it is unnecessary to ascribe malice to the appellate judges deciding these terrible cases. No one wants to be reversed by the Supreme Court, and the Supreme Court's summary reversals of qualified immunity cases are ever-more biting.[159] If you've been a Circuit Judge since 1979—sitting on the bench longer than any current Justice—you might expect a more forgiving reversal.[160] Other appellate judges see these decisions, read the tea leaves, and realize it is safer to find debatable whether it was a clearly established Constitutional violation to force a prisoner to eat, sleep, and live in prison cells swarming in feces for six days.

It is also unnecessary to blame the doctrine of qualified immunity on ideology. "Although the Court is not always unanimous on these issues, it is fair to say that qualified immunity has been as much a liberal as a conservative project on the Supreme Court."[161] Judges disagree in these cases no matter which President appointed them.[162] Qualified immunity is

---

[158] *Zadeh v. Robinson*, 928 F.3d 457, 479–80 (5th Cir. 2019) (Willett, J., concurring in part and dissenting in part).

[159] *See, e.g.*, *White*, 137 S. Ct. at 552 (per curiam) (chastising the appellate court for "misunderst[anding] the 'clearly established' analysis"). Professor Baude says the Court has been on a "crusade." Baude, *supra* at 61.

[160] *See White*, 137 S. Ct. at 552.

[161] Samuel R. Bagenstos, *Who Is Responsible for the Stealth Assault on Civil Rights?*, 114 MICH. L. REV. 893, 909 (2016).

[162] *See, e.g.*, *Pratt v. Harris Cty., Tex.*, 822 F.3d 174, 186 (5th Cir. 2016).

one area proving the truth of Chief Justice Roberts' statement, "We do not have Obama judges or Trump judges, Bush judges or Clinton judges."[163]

There are numerous critiques of qualified immunity by lawyers,[164] judges,[165] and academics.[166] Yet qualified immunity is the law of the land and the undersigned is bound to follow its terms absent a change in practice by the Supreme Court.

Here is the exact legal standard applicable in this circuit:

> There are generally two steps in a qualified immunity analysis. "First, a court must decide whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional

---

[163] Adam Liptak, *Chief Justice Defends Judicial Independence After Trump Attacks 'Obama Judge'*, N.Y. TIMES (Nov. 21, 2018).

[164] *See, e.g.,* Brief of Cross-Ideological Groups Dedicated to Ensuring Official Accountability, Restoring the Public's Trust in Law Enforcement, and Promoting the Rule of Law as Amici Curiae in Support of Petitioner, *Baxter v. Bracey*, 140 S. Ct. 1862 (2020) (No. 18-1287), 2019 WL 2370285.

[165] *See, e.g., Horvath v. City of Leander*, 946 F.3d 787, 795 (5th Cir. 2020) (Ho, J., concurring in part and dissenting in part); *Zadeh*, 928 F.3d at 474 (Willett, J., concurring in part and dissenting in part); *Manzanares v. Roosevelt Cty. Adult Det. Ctr.*, 331 F. Supp. 3d 1260, 1293 n.10 (D.N.M. 2018); *Estate of Smart v. City of Wichita*, No. 14-2111-JPO, 2018 WL 3744063, at *18 n.174 (D. Kan. Aug. 7, 2018); *Thompson v. Clark*, No. 14-CV-7349, 2018 WL 3128975, at *10 (E.D.N.Y. June 26, 2018); *Baldwin v. City of Estherville*, 915 N.W.2d 259, 283 (Iowa 2018) (Appel, J., dissenting); James A. Wynn, Jr., *As a judge, I have to follow the Supreme Court. It should fix this mistake*, WASH. POST (June 12, 2020).

[166] *See, e.g., The Case Against Qualified Immunity, supra*; Baude, *supra*; Fred O. Smith, Jr., *Abstention in the Time of Ferguson*, 131 HARV. L. REV. 2283, 2305 (2018); *What's Wrong with Qualified Immunity?, supra*; Christina Brooks Whitman, *Emphasizing the Constitutional in Constitutional Torts*, 72 CHI.-KENT L. REV. 661, 678 (1997).

right. Second . . . the court must decide whether the right at issue was clearly established at time of the defendant's alleged misconduct." However, we are not required to address these steps in sequential order.

In Fourth Amendment cases, determining whether an official violated clearly established law necessarily involves a reasonableness inquiry. In *Pearson*, the Supreme Court explained that [an] officer is "entitled to qualified immunity where clearly established law does not show that the conduct violated the Fourth Amendment," a determination which "turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." However, "a reasonably competent public official should know the law governing his conduct." In general, "the doctrine of qualified immunity protects government officials from . . . liability when they reasonably could have believed that their conduct was not barred by law, and immunity is not denied unless existing precedent places the constitutional question *beyond debate*." [167]

The Court will now consider Jamison's claims under these two steps.

---

[167] *Heaney v. Roberts*, 846 F.3d 795, 801 (5th Cir. 2017) (citations and brackets omitted).

## IV.     Qualified Immunity Analysis

### A.     Violation of a Statutory or Constitutional Right

The Court has already determined that Officer McClendon is
entitled to qualified immunity for his decision to pull over
Jamison.[168] The Court now turns to the stop itself.

### 1.     Physical Intrusion

"In a valid traffic stop, an officer may request a driver's li-
cense and vehicle registration and run a computer check."[169]
Officers are also permitted "to require passengers to identify
themselves," and "[w]hile waiting for the results of computer
checks, the police can question the subjects of a traffic stop
even on subjects unrelated to the purpose of the stop."[170]

Officers are not allowed to unreasonably intrude into a per-
son's vehicle. "While the interior of an automobile is not sub-
ject to the same expectations of privacy that exist with respect
to one's home, a car's interior as a whole is nonetheless subject
to Fourth Amendment protection from unreasonable intru-
sions by the police."[171] It follows that an "officer's intrusion
into the interior of [a] car constitute[s] a search."[172]

---

[168] *See* Docket No. 62.

[169] *United States v. Estrada*, 459 F.3d 627, 631 (5th Cir. 2006) (citation omit-
ted).

[170] *United States v. Spence*, 667 F. App'x 446, 447 (5th Cir. 2016) (citations
omitted).

[171] *New York v. Class*, 475 U.S. 106, 114–15 (1986).

[172] *United States v. Pierre*, 958 F.2d 1304, 1309 (5th Cir. 1992); *see also United
States v. Ryles*, 988 F.2d 13, 15 (5th Cir. 1993).

"[T]he intrusiveness of the search is not measured so much by its scope as by whether it invades an expectation of privacy that society is prepared to recognize as 'reasonable.'"[173] Accordingly, "the key inquiry" in these cases is whether the officer "acted reasonably" when he intruded.[174] The question is highly dependent on the facts of each case.[175]

Here, Jamison argues that Officer McClendon "physically prevent[ed] Mr. Jamison from resuming his travel by placing his arm inside Mr. Jamison's automobile."[176] Viewing the evidence in the light most favorable to the non-movant, the Court must conclude for present purposes that the stop happened in this way. Officer McClendon's insertion of his arm into Jamison's vehicle is an "intru[sion] inside a space that, under most circumstances, is protected by a legitimate expectation of privacy."[177] The Court must therefore consider whether Officer McClendon acted reasonably when he intruded.

In *United States v. Pierre*, Border Patrol Agent Lonny Hillin stopped a GMC Jimmy at a fixed checkpoint in Texas.[178] The Jimmy was a "two-door vehicle . . . equipped with tinted fixed rear windows."[179] The defendant, Pierre, "was lying down in

---

[173] *Pierre*, 958 F.2d at 1309 (citation omitted).

[174] *Id.*

[175] *See id.*

[176] Docket No. 68 at 21.

[177] *Ryles*, 988 F.2d at 15 (citations omitted).

[178] *Pierre*, 958 F.2d at 1307.

[179] *Id.*

the back seat."[180] During the stop, Agent Hillin "ducked his head in the window to get a clear view of the back seat and to talk to Pierre about his citizenship."[181] The Fifth Circuit considered the following to determine if the agent's intrusion was reasonable: (1) whether the officer intruded upon an area for which there is a reasonable expectation of privacy; (2) whether the officer's "actions were no more intrusive than necessary to accomplish his objective"; and (3) whether the intrusion was reasonable to ensure the safety of the officer.[182]

As to the first consideration, the Fifth Circuit found that "passengers of vehicles at fixed checkpoints near the border of the United States do not have a reasonable expectation of privacy in not being stopped and questioned about their citizenship."[183] The court reasoned that "occupants of a vehicle stopped at a checkpoint have no expectancy that they will not be required to look an agent in the eye and answer questions about their citizenship."[184] In *Pierre*, the "physical features of the Jimmy made it difficult for Agent Hillin to speak with Pierre and verify his citizenship."[185] These considerations weighed toward finding that the agent's intrusion – in this case, sticking his head into the car – was reasonable.[186]

---

[180] *Id.*

[181] *Id.* (quotations and brackets omitted).

[182] *Id.* at 1309–10.

[183] *Id.* at 1309.

[184] *Id.* at 1310.

[185] *Id.* at 1309.

[186] *Id.* at 1310.

The Fifth Circuit also found that the sole purpose of Agent Hillin's intrusion was to ask about the passenger's citizenship. Again, the Court noted that vehicle's physical features did not allow Agent Hillin "to see and communicate with Pierre."[187] The court observed that "Agent Hillin's action in sticking his head in the driver's window was certainly less intrusive than requiring Pierre to get out of the vehicle."[188]

Finally, "in evaluating the reasonableness of the search," the Fifth Circuit "considered the safety of the officer."[189] It held that "[a]n agent at a checkpoint, for his own safety, would have good reason to position himself so he could see the person with whom he is speaking."[190]

Here, Jamison had no reasonable expectation of privacy as to being questioned during a lawful stop.[191] However, there is no evidence that the physical features of Jamison's car or any other circumstance made it difficult for Officer McClendon to question Jamison. Accordingly, this first consideration weighs against finding that Officer McClendon acted reasonably when he put his arm into Jamison's car.

Turning to the second consideration, Officer McClendon admitted that his objective was to get Jamison's consent to search the car. He had no reason to physically put his arm into

---

[187] *Id.*

[188] *Id.*

[189] *Id.* (citation omitted).

[190] *Id.*

[191] *See Spence*, 667 F. App'x at 447.

46

the car to accomplish that objective. This situation is inapposite to *Pierre*, where the agent had to intrude in to the car to "see and communicate with Pierre."[192]

As to the third consideration, the same principle discussed in *Pierre* obviously applies here: officers have good reason to see the person they have pulled over. Officer McClendon, however, could already see Jamison. There was no reason to put his arm into Jamison's car to request that he consent to a search, and nothing in this record or the parties' briefs attempts to support that view.

In *Pierre*, the Fifth Circuit emphasized that officers do not have "carte blanche authority" to intrude into vehicles.[193] All of the considerations discussed in *Pierre* point toward a finding that Officer McClendon acted unreasonably.

For these reasons, Officer McClendon's physical intrusion into Jamison's car was an unreasonable search in violation of the Fourth Amendment.

### 2.     Subsequent Vehicle Search

Officer McClendon then argues that Jamison consented to the search of his car. Jamison concedes that he "consented" but argues that his consent was involuntary.

"Consent is valid only if it is voluntary."[194] "Furthermore, if an individual gives consent after being subject to an initial un-

---

[192] *Pierre*, 958 F.2d at 1310.

[193] *Id.*

[194] *United States v. Gomez-Moreno*, 479 F.3d 350, 357 (5th Cir. 2007) (citation omitted), *overruled on other grounds by Kentucky v. King*, 563 U.S. 452 (2011).

constitutional search, the consent is valid only if it was an independent act of free will, breaking the causal chain between the consent and the constitutional violation."[195] Factors that inform whether the consent was an independent act of free will include the "temporal proximity of the illegal conduct and the consent," whether there were any intervening circumstances, and "the purpose and flagrancy" of the misconduct.[196]

The Court has found a constitutional violation in Officer McClendon's intrusion into Jamison's vehicle. Jamison's "consent to search . . . was contemporaneous with the constitutional violation, and there was no intervening circumstance."[197] Viewing the evidence in the light most favorable to Jamison, as the legal standard requires, he relented and agreed to the search only after Officer McClendon escalated his efforts and placed his arm inside the car. Officer McClendon's intrusion into Jamison's car was a purposeful and unreasonable entry into an area subject to Fourth Amendment protection. "Thus, under the circumstances of this case, the consent to search was not an independent act of free will, but rather a product of" an unconstitutional search.[198]

Even absent the initial constitutional violation, there is a factual dispute as to whether Jamison's consent was voluntary.

---

[195] *Id.* (quotations and citation omitted).

[196] *United States v. Hernandez*, 279 F.3d 302, 307 (5th Cir. 2002) (citation omitted).

[197] *United States v. Santiago*, 310 F.3d 336, 343 (5th Cir. 2002) (citations omitted).

[198] *Id.*

"The voluntariness of consent is a question of fact to be determined from the totality of all the circumstances."[199] To determine whether a person's consent was voluntary, the Court considers six factors: "(1) the voluntariness of the suspect's custodial status; (2) the presence of coercive police procedures; (3) the nature and extent of the suspect's cooperation; (4) the suspect's awareness of his right to refuse consent; (5) the suspect's education and intelligence; and (6) the suspect's belief that no incriminating evidence will be found."[200] "In this analysis, no single factor is determinative"[201] and courts consider other factors relevant to the inquiry.[202]

Viewing the evidence in the light most favorable to Jamison, three factors weigh toward finding voluntary consent. Jamison was aware of his right to refuse consent; he refused to give consent after being asked four times by Officer McClendon. Jamison graduated from high school and there is nothing in the record showing that he "lack[ed] the requisite education or intelligence to give valid consent to the search."[203] Finally, Jamison believed – rightly so – that no incriminating evidence would be found.

The remaining factors weigh against finding voluntary consent. Jamison's custodial status was not voluntary: he was not

---

[199] *United States v. Shabazz*, 993 F.2d 431, 438 (5th Cir. 1993) (quotations and citation omitted).

[200] *United States v. Escamilla*, 852 F.3d 474, 483 (5th Cir. 2017) (citation omitted).

[201] *United States v. Macias*, 658 F.3d 509, 523 (5th Cir. 2011) (citation omitted).

[202] *United States v. Tompkins*, 130 F.3d 117, 122 (5th Cir. 1997) (citation omitted).

[203] *United States v. Cooper*, 43 F.3d 140, 148 (5th Cir. 1995).

free to leave. Jamison was also polite but unwilling to let Officer McClendon search his car the first four times the Officer asked. It is difficult to accept that Jamison truly wanted to give consent, since the exchange became "heated." Moreover, when Officer McClendon brought out his canine, Jamison says that he initially refused to consent to the dog sniff.

The parties disagree about whether Officer McClendon's actions were coercive. Jamison mainly points to Officer McClendon's intrusion into the car and repeated requests for consent. Officer McClendon, on the other hand, points to a number of cases where (he claims) other courts cleared officers who used greater restraints on a person's freedom.[204]

Jamison also points to "promises" and other "more subtle forms of coercion" that might have affected his judgment.[205] The existence of a promise indeed constitutes a relevant factor in the Court's determination.[206]

There is a genuine factual dispute about whether Officer McClendon's actions amount to coercive procedures. There is evidence of omissions, outright lies, and promises by the officer: he did not inform Jamison that the EPIC check had come back clear, he lied about a call saying Jamison was transporting drugs, and he promised Jamison that he would allow him to leave if he found a roach in the car. A jury could reasonably conclude that Officer McClendon's lies reasonably caused Jamison to fear that the officer would plant drugs in his car, or worse. McClendon's statement to "Hold on a minute" and

---

[204] *See, e.g., Tompkins*, 130 F.3d at 122; *United States v. Olivarria*, 781 F. Supp. 2d 387, 395 (N.D. Miss. 2011).

[205] *United States v. Hall*, 565 F.2d 917, 921 (5th Cir. 1978).

[206] *See United States v. Fernandes*, 285 F. App'x 119, 124 (5th Cir. 2008).

his physical intrusion into the interior of Jamison's car, while separately a constitutional violation, had the effect of physically expressing to Jamison that he was not free to leave – even though Jamison reasonably believed he could go after Officer McClendon returned his documents.

For these reasons, the Court finds a genuine factual dispute about whether Jamison voluntarily consented to the search.

A reader would be forgiven for pausing here and wondering whether we forgot to mention something.[207] When in this analysis will the Court look at the elephant in the room—how race may have played a role in whether Officer McClendon's actions were coercive?[208]

Jamison was a Black man driving through Mississippi, a state known for the violent deaths of Black people and others who fought for their freedom. Pelahatchie is an hour south of Philadelphia, a town made infamous after a different kind of traffic stop resulted in the brutal lynching of James Chaney, Michael Schwerner, and Andrew Goodman.[209] Pelahatchie is

---

[207] *Cf.* Cynthia Lee, *Reasonableness with Teeth: The Future of Fourth Amendment Reasonableness Analysis*, 81 MISS. L.J. 1133, 1151 n.81 (2012) (identifying cases in which the Supreme Court failed to recognize the potential impact of race and racism).

[208] *Cf. United States v. Mendenhall*, 446 U.S. 544, 558 (1980) (noting that the race, gender, age, and education of a young Black woman who "may have felt unusually threatened by the officers, who were white males" were all relevant factors in determining whether the woman voluntarily consented to a seizure).

[209] U.S. DEP'T OF JUSTICE, CIVIL RIGHTS DIV., INVESTIGATION OF THE 1964 MURDERS OF MICHAEL SCHWERNER, JAMES CHANEY, AND ANDREW GOODMAN 7–8 (2018), *available at* https://www.justice.gov/crt/case-document/file/1041791/download.

also less than 30 minutes east of Jackson, where on June 26, 2011, a handful of young white men and women engaged in some old-fashioned Redemption and murdered James Craig Anderson, a 47-year old Black, gay man.[210] Pelahatchie is also in Rankin County, the same county the young people called home. Only a few miles separate the two communities.

For Black people, this isn't mere history. It's the present.

By the time Jamison was pulled over, more than 600 people had been killed by police officers in 2013 alone.[211] Jamison was stopped just 16 days after the man who killed Trayvon Martin was acquitted.[212] On that day, Alicia Garza wrote a Facebook post that said, "Black people. I love you. I love us. We matter. Our lives matter, Black lives matter."[213] And that week, "thousands of demonstrators gathered in dozens of cities" to commemorate Martin "and to add their voices to a debate on race

---

[210] Albert Samaha, *"This Is What They Did For Fun": The Story Of A Modern-Day Lynching*, BUZZFEED NEWS (Nov. 18, 2015); *see also* Press Release, U.S. Dep't of Justice, Three Brandon, Miss., Men Plead Guilty for Their Roles in the Racially Motivated Assault and Murder of an African-American Man (Mar. 22, 2012) *available at* https://www.justice.gov/opa/pr/three-brandon-miss-men-plead-guilty-their-roles-racially-motivated-assault-and-murder-african.

[211] *See* MAPPING POLICE VIOLENCE, https://mappingpoliceviolence.org/ (last accessed June 15, 2020).

[212] Lizette Alvarez & Cara Buckley, *Zimmerman Is Acquitted in Trayvon Martin Killing*, N.Y. TIMES (July 13, 2013).

[213] Elazar Sontag, *To this Black Lives Matter co-founder, activism begins in the kitchen*, WASH. POST (Mar. 26, 2018); *see also* Garrett Chase, *The Early History of the Black Lives Matter Movement, and the Implications Thereof*, 18 NEV. L.J. 1091, 1095 (2018).

that his death . . . set off."[214] A movement was in its early stages that would shine a light on killings by police and police brutality writ large – a problem Black people have endured since "states replaced slave patrols with police officers who enforced 'Black codes.'"[215]

Jamison's traffic stop cannot be separated from this context. Black people in this country are acutely aware of the danger traffic stops pose to Black lives.[216] Police encounters happen regardless of station in life or standing in the community; to Black doctors, judges, and legislators alike.[217] United States

---

[214] Channing Joseph & Ravi Somaiya, *Demonstrations Across the Country Commemorate Trayvon Martin*, N.Y. TIMES (July 21, 2013).

[215] Hannah L.F. Cooper, *War on Drugs Policing and Police Brutality*, 50 SUBSTANCE USE & MISUSE 1188, 1189 (2015); *see also* Elizabeth Hinton & DeAnza Cook, *The Mass Criminalization of Black Americans: A Historical Overview*, 1 ANN. REV. CRIMINOLOGY 2.1, 2.3 (forthcoming 2021); Katheryn Russell-Brown, *Making Implicit Bias Explicit: Black Men and the Police*, in POLICING THE BLACK MAN 139–40 (Angela J. Davis ed., 2018); Brandon Hasbrouck, *The 13th Amendment Could End Racist Policing*, SLATE (June 5, 2020).

[216] *See, e.g.*, Ron Stodghill, *Black Behind the Wheel*, N.Y. TIMES (July 14, 2020); Helen Sullivan et al., *Thousands continue protesting across US as Minneapolis vows to dismantle police department – as it happened*, THE GUARDIAN (June 12, 2020). "There's a long history of black and brown communities feeling unsafe in police presence." *United States v. Curry*, No. 18-4233, 2020 WL 3980362, at *13 (4th Cir. July 15, 2020) (Gregory, C.J., concurring).

[217] *See* Crystal Bonvillian, *Video: Black Miami doctor who tests homeless for COVID-19 handcuffed, detained outside own home*, KIRO 7 (Apr. 14, 2020); David A. Harris, *Racial Profiling: Past, Present, and Future?*, ABA CRIM. JUSTICE MAG. (Winter 2020) (recounting the suit and settlement achieved by Robert Wilkins, U.S. Circuit Judge for the D.C. Circuit); Louis Nelson, *Sen. Tim Scott reveals incidents of being targeted by Capitol Police*, POLITICO (July 13, 2016).

Senator Tim Scott was pulled over seven times in one year—and has even been stopped while a member of what many refer to as "the world's greatest deliberative body."[218] The "vast majority" of the stops were the result of "nothing more than driving a new car in the wrong neighborhood or some other reason just as trivial."[219]

_____

In a moving speech delivered from the Senate floor just last month, Senator Scott said,

> As a black guy, I know how it feels to walk into a store and have the little clerk follow me around, even as a United States Senator. I get that. I've experienced that. I understand the traffic stops. I understand that when I'm walking down the street and some young lady clutches on to her purse and my instinct is to get a little further away because I don't want any issues with anybody, I understand that.

*See* U.S. Senator Tim Scott, Senator Tim Scott Delivers Fiery Speech on Senate Floor After Senate Democrats Stonewall Legislation on Police Reform Across America (June 24, 2020), *available at* https://www.scott.senate.gov/media-center/press-releases/senator-tim-scott-delivers-fiery-speech-on-senate-floor-after-senate-democrats-stonewall-legislation-on-police-reform-across-america.

[218] Tim Scott, *GOP Sen. Tim Scott: I've choked on fear when stopped by police. We need the JUSTICE Act.*, USA TODAY (June 18, 2020).

[219] Nelson, *supra* ("Scott also shared the story of a former staffer of his who drove a Chrysler 300, 'a nice car without any question, but not a Ferrari.' The staffer wound up selling that car out of frustration after being pulled over too often in Washington, D.C., 'for absolutely no reason other than for driving a nice car.' He told a similar story of his brother, a command sergeant major in the U.S. Army, who was pulled over by an officer suspicious that the car Scott's brother was driving was stolen because it was a Volvo. . . . Scott pleaded in his remarks that the issues African-Americans face in dealing with law enforcement not be ignored.").

The situation is not getting better. The number of people killed by police each year has stayed relatively constant,[220] and Black people remain at disproportionate risk of dying in an encounter with police.[221] It was all the way back in 1968 when Nina Simone famously said that freedom meant "no fear! I mean really, no fear!"[222] Yet decades later, Black male teens still report a "fear of police and a serious concern for their personal safety and mortality in the presence of police officers."[223]

In an America where Black people "are considered dangerous even when they are in their living rooms eating ice cream, asleep in their beds, playing in the park, standing in the pulpit of their church, birdwatching, exercising in public, or walking home from a trip to the store to purchase a bag of Skittles,"[224] who can say that Jamison felt free that night on the side of Interstate 20? Who can say that he felt free to say no to an armed Officer McClendon?

---

[220] *See, e.g.,* John Sullivan et al., *Four years in a row, police nationwide fatally shoot nearly 1,000 people*, WASH. POST (Feb. 12, 2019).

[221] Niall McCarthy, *Police Shootings: Black Americans Disproportionately Affected [Infographic]*, FORBES (May 28, 2020) ("Black Americans . . . are shot and killed by police [at] more than twice . . . the rate for white Americans.").

[222] Adam Shatz, *The Fierce Courage of Nina Simone*, N.Y. REV. OF BOOKS (Mar. 10, 2016).

[223] Smith Lee & Robinson, *That's My Number One Fear in Life. It's the Police":* *Examining Young Black Men's Exposures to Trauma and Loss Resulting From Police Violence and Police Killings*, 45 J. BLACK PSYCH. 143, 146 (2019) (citation omitted).

[224] *Curry*, 2020 WL 3980362, at *14 (Gregory, C.J., concurring).

It was in this context that Officer McClendon repeatedly lied to Jamison. It was in this moment that Officer McClendon intruded into Jamison's car. It was upon this history that Jamison said he was tired. These circumstances point to Jamison's consent being involuntary, a situation where he felt he had "no alternative to compliance" and merely mouthed "pro forma words of consent."[225]

Accordingly, Officer McClendon's search of Jamison's vehicle violated the Fourth Amendment.

### B.    Violation of Clearly Established Law

The Court must now determine whether Officer McClendon "violated clearly established constitutional rights of which a reasonable person would have known."[226]

"A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'"[227] "Clearly established law must be particularized to the facts of a case. Thus, while a case need not be directly on point, precedent must still put the underlying question beyond debate."[228] District courts in this Circuit have been told that "clearly established law comes from holdings, not dicta."[229] We "are to pay close attention to

---

[225] *United States v. Ruigomez*, 702 F.2d 61, 65 (5th Cir. 1983).

[226] *Samples v. Vadzemnieks*, 900 F.3d 655, 662 (5th Cir. 2018) (quotations, citations, and ellipses omitted).

[227] *Mullenix*, 136 S. Ct. at 308 (citation omitted).

[228] *Id.* (quotations and citation omitted).

[229] *Morrow v. Meachum*, 917 F.3d 870, 875 (5th Cir. 2019) (citations omitted).

the specific context of the case" and not "define clearly established law at a high level of generality."[230]

 "It is the plaintiff's burden to find a case in his favor that does not define the law at a high level of generality."[231] To meet this high burden, the plaintiff must "point to controlling authority—or a robust consensus of persuasive authority—that defines the contours of the right in question with a high degree of particularity."[232]

It is here that the qualified immunity analysis ends in Officer McClendon's favor.

Viewing the facts in the light most favorable to Jamison, the question in this case is whether it was clearly established that an officer who has made five sequential requests for consent to search a car, lied, promised leniency, and placed his arm inside of a person's car during a traffic stop while awaiting background check results has violated the Fourth Amendment. It is not.

Jamison identifies a Tenth Circuit case finding that an officer unlawfully prolonged a detention "after verifying the temporary tag was valid and properly displayed."[233] That court wrote that "[e]very temporary tag is more difficult to read in

---

[230] *Anderson v. Valdez*, 913 F.3d 472, 476 (5th Cir. 2019) (quotations and citations omitted).

[231] *Rich v. Palko*, 920 F.3d 288, 294 (5th Cir. 2019) (quotations and citation omitted).

[232] *McLin v. Ard*, 866 F.3d 682, 696 (5th Cir. 2017) (quotations and citation omitted).

[233] Docket No. 68 at 20 (citing *United States v. Edgerton*, 438 F.3d 1043, 1051 (10th Cir. 2006)).

the dark when a car is traveling 70 mph on the interstate. But that does not make every vehicle displaying such a tag fair game for an extended Fourth Amendment seizure."[234] Aside from the fact that a Tenth Circuit case is not "controlling authority" nor representative of "a robust consensus of persuasive authority,"[235] the case is unavailing here since Officer McClendon was awaiting NCIC results when he began to question Jamison. As discussed above, questioning while awaiting results from an NCIC check is "not inappropriate."[236] Officer McClendon's initial questioning was not in and of itself a Fourth Amendment violation.

As to Officer McClendon's "particular conduct" of intruding into Jamison's vehicle, making promises of leniency, and repeatedly questioning him, Jamison primarily argues that "a genuine issue of material fact exists regarding the voluntariness of Mr. Jamison's alleged consent to allow the Defendant McLendon to search his car."[237] He contends that a grant of "qualified immunity [is] inappropriate based on those factual conflicts."[238]

---

[234] *Edgerton*, 438 F.3d at 1051.

[235] *Palko*, 920 F.3d at 294.

[236] *United States v. Zucco*, 71 F.3d 188, 190 (5th Cir. 1995).

[237] Docket No. 68 at 23.

[238] *Id.* at 24 (citing *Jordan v. Wayne Cty., Miss.*, No. 2:16-CV-70-KS-MTP, 2017 WL 2174963, at *5 (S.D. Miss. May 17, 2017)).

To prevail with this argument, Jamison must show that the factual dispute is such that the Court cannot "settl[e] on a coherent view of what happened in the first place."[239] Further, "[Jamison's] version of the violations [should] implicate clearly established law."[240] That is not the case here.

While Jamison and Officer McClendon's recounting of the facts differs, the Court is able to settle on a coherent view of what occurred based on Jamison's version of the facts.[241] Considering the evidence in a light "most favorable" to Jamison,"[242] Jamison has failed to show that Officer McClendon acted in an objectively unreasonable manner. An officer's "acts are held to be objectively reasonable unless all reasonable officials in the defendant's circumstances would have then known that the defendant's conduct violated the United States Constitution or the federal statute as alleged by the plaintiff."[243]

While Jamison contends that Officer McClendon's intrusion was coercive, Jamison fails to support the claim with relevant precedent. He cites to this Court's opinion in *United States v. Alvarado*, which found it unreasonable to detain a person on the side of the highway for an hour "for reasons not tied to reasonable suspicion that he had committed a crime or was

---

[239] *Lampkin v. City of Nacogdoches*, 7 F.3d 430, 435 (5th Cir. 1993); *see also Mangieri v. Clifton*, 29 F.3d 1012, 1016 (5th Cir. 1994).

[240] *Johnston v. City of Houston, Tex.*, 14 F.3d 1056, 1061 (5th Cir. 1994).

[241] *Contra Lampkin*, 7 F.3d at 435 ("The facts leading up to these mistakes are not consistent among various officers' testimony and affidavits.").

[242] *Id.*

[243] *Thompson v. Upshur Cty., TX*, 245 F.3d 447, 457 (5th Cir. 2001).

engaged in the commission of a crime."[244] However, this Court's opinions cannot serve as "clearly established" precedent.[245] Moreover, the facts of that case are distinguishable since the defendant in *Alvarado* was unlawfully held after background checks came back clear.[246]

The cases the Court cited above regarding physical intrusions – *United States v. Pierre* and *New York v. Class* – are also insufficient. While it has been clearly established since at least 1986 that an officer may be held liable for an unreasonable "intrusion into the interior of [a] car,"[247] this is merely a "general statement[] of the law."[248] "[C]learly established law must be particularized to the facts of the case."[249]

In *Pierre*, the officer could not see into the suspect's back seat and had to put his head inside to speak to the suspect. In *Class*, the suspect had been removed from his car and the officer put his hand inside to move papers so that he could see the car's VIN. Neither case considered a police officer putting his arm inside a car while trying to get the driver to consent to a search. Both cases also found the officer's conduct to be reasonable, thus not providing "fair and clear warning" of what constitutes an unreasonable intrusion into a car.

---

[244] *United States v. Alvarado*, 989 F. Supp. 2d 505, 522 n.21 (S.D. Miss. 2013).

[245] *See McCoy*, 950 F.3d at 233 n.6.

[246] *Alvarado*, 989 F. Supp. 2d at 522.

[247] *Pierre*, 958 F.2d at 1309; *see also Class*, 475 U.S. at 114–15.

[248] *White*, 137 S. Ct. at 552 (quotations and citation omitted).

[249] *Id.* (quotations and citation omitted).

Given the lack of precedent that places the Constitutional question "beyond debate," Jamison's claim cannot proceed.[250] Officer McClendon is entitled to qualified immunity as to Jamison's prolonged detention and unlawful search claims.

## V.      Jamison's Seizure of Property & Damage Claim

Jamison's complaint pleads a separate claim for the "reckless[] and deliberate[]" damage to his car he alleges occurred during Officer McClendon's search. Jamison points out, however, that although Officer McClendon sought summary judgment as to all claims and an entry of final judgment, neither his original nor his renewed motion for summary judgment provided an argument as to this third claim.

Jamison is correct. Officer McClendon's failure to raise the argument in his motions for summary judgment means he has forfeited its resolution at this juncture.[251] And his attempt to shoehorn it into his reply in support of his renewed motion for summary judgment was too late, since "[a]rguments

---

[250] *Id.* at 551 (quotations and citation omitted).

[251] *See Bank of Am. Nat'l Ass'n v. Stauffer*, 728 F. App'x 412, 413 (5th Cir. 2018). The situation is inapposite to the cases in Officer McClendon's reply brief. Both *Vela v. City of Houston*, 276 F.3d 659 (5th Cir. 2001), and *Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1156 (5th Cir. 1983), concerned cases in which a party argued for summary judgment on claims and the opposing party failed to address at least one of the theories of recovery in its response. In such cases, the Fifth Circuit held that the nonmoving party "abandoned its alternative theories of recovery [or defenses] by failing to present them to the trial court." *Vela*, 276 F.3d at 678–79. Here, however, Officer McClendon failed to raise an argument in his original brief as to Jamison's third claim.

raised for the first time in a reply brief are waived."[252] The question of whether to grant or deny summary judgment as to Jamison's "Seizure of Property & Damage Claim" is simply not before the court. Accordingly, the claim will be set for trial.

## VI.   The Return of Section 1983

Our nation has always struggled to realize the Founders' vision of "a more perfect Union."[253] From the beginning, "the Blessings of Liberty" were not equally bestowed upon all Americans.[254] Yet, as people marching in the streets remind us today, some have always stood up to face our nation's failings and remind us that "we cannot be patient."[255] Through their efforts we become ever more perfect.

The U.S. Congress of the Reconstruction era stood up to the white supremacists of its time when it passed Section 1983. The late Congressman John Lewis stared down the racists of his era when he marched over the Edmund Pettus Bridge. The Supreme Court has answered the call of history as well, most famously when it issued its unanimous decision in *Brown v.*

---

[252] *Dixon v. Toyota Motor Credit Corp.*, 794 F.3d 507, 508 (5th Cir. 2015); *see also Dugger v. Stephen F. Austin State Univ.*, 232 F. Supp. 3d 938, 957 (E.D. Tex. 2017) (collecting cases demonstrating that "courts disregard new evidence or argument offered for the first time in the reply brief").

[253] U.S. Const. pmbl.

[254] *Id.*

[255] John Lewis, Speech at the March on Washington (Aug. 28, 1963), *available at* https://voicesofdemocracy.umd.edu/lewis-speech-at-the-march-on-washington-speech-text/.

*Board of Education* and resigned the "separate but equal" doctrine to the dustbin of history.

The question of today is whether the Supreme Court will rise to the occasion and do the same with qualified immunity.

### A.       The Supreme Court

That the Justices haven't acted so far is perhaps understandable. Not only would they likely prefer that Congress fixes the problem, they also value *stare decisis*, the legal principle that means "fidelity to precedent."[256]

S*tare decisis*, however, "isn't supposed to be the art of methodically ignoring what everyone knows to be true."[257] From Tik-Tok[258] to the chambers of the Supreme Court, there is increasing consensus that qualified immunity poses a major problem to our system of justice.

Justice Kennedy "complained"[259] as early as 1992 that in qualified immunity cases, "we have diverged to a substantial degree from the historical standards."[260] Justice Scalia admitted that the Court hasn't even "purported to be faithful to the

---

[256] *See June Med. Servs. L.L.C. v. Russo*, No. 18-1323, 2020 WL 3492640, at *22 (U.S. June 29, 2020) (Roberts, C.J., concurring).

[257] *Ramos*, 140 S. Ct. at 1405 (citation omitted).

[258] *See, e.g.,* @thekaranmenon, Tɪᴋᴛᴏᴋ (June 7, 2020), https://vm.tik-tok.com/JLVfBkn/.

[259] That's Professor Baude's word, not mine. Baude, *supra* at 61.

[260] *Wyatt v. Cole*, 504 U.S. 158, 170 (1992) (Kennedy, J., concurring).

common-law immunities that existed when § 1983 was enacted."[261] Justice Thomas wrote there is "no basis" for the "clearly established law" analysis[262] and has expressed his "growing concern with our qualified immunity jurisprudence."[263] Justice Sotomayor has noted that her colleagues were making the "clearly established" analysis ever more "onerous."[264] In her view, the Court's doctrine "tells officers that they can shoot first and think later, and it tells the public that palpably unreasonable conduct will go unpunished."[265] It remains to be seen how the newer additions to the Court will vote.[266]

---

[261] *Crawford-El v. Britton*, 523 U.S. 574, 611 (1998) (Scalia, J., joined by Thomas, J., dissenting) (citation omitted).

[262] *Baxter*, 140 S. Ct. at 1864 (Thomas, J., dissenting from the denial of certiorari).

[263] *Ziglar*, 137 S. Ct. at 1870 (Thomas, J., concurring in part).

[264] *Kisela v. Hughes*, 138 S. Ct. 1148, 1158 (2018) (Sotomayor, J., joined by Ginsburg, J., dissenting); *see also Mullenix*, 136 S. Ct. at 316 (Sotomayor, J., dissenting).

[265] *Id.* at 1162.

[266] According to one analysis, Justice Gorsuch's record on the Tenth Circuit signaled that he "harbors a robust—though not boundless—vision of qualified immunity" and "is sensitive to the practical concerns qualified immunity is meant to mollify—namely, the realities of law enforcement." Shannon M. Grammel, *Judge Gorsuch on Qualified Immunity*, 69 STAN. L. REV. ONLINE 163 (2017). On the Court of Appeals, however, those were the concerns then-Judge Gorsuch was supposed to honor. The genius of the law is that, as now-Justice Gorsuch observed in 2019, "[t]he Court bows to the lessons of experience and the force of better reasoning, recognizing that the process of trial and error, so fruitful in the physical sciences, is appropriate also in the judicial function." *Gamble v. United States*, 139 S. Ct. 1960, 2006 (2019) (Gorsuch, J., dissenting) (quoting Justice Brandeis).

Even without a personnel change, recent decisions make it questionable whether qualified immunity can withstand the *stare decisis* standard.[267] In 2018, *Janus v. AFSCME* overruled *Abood v. Detroit Board of Education*; in 2019, *Knick v. Township of Scott* overruled *Williamson County v. Hamilton Bank*; and in 2020, *Ramos v. Louisiana* overruled *Apodoca v. Oregon*. Perhaps this Court is more open to a course-correction than its predecessors.

So what is there to do?

I do not envy the Supreme Court's duty in these situations. Nor do I have any perfect solutions to offer. But a Fifth Circuit case about another Reconstruction-era statute, 42 U.S.C. § 1981, suggests vectors of change. The case has been lost to the public by a fluke of how it was revised. I share its original version here to give a tangible example of how easily legal doctrine can change.

---

Sometimes our understanding of words changes, too, as we glean new insight into the meaning of an authoritative text. *See, e.g.*, *Bostock v. Clayton Cty., Georgia*, 140 S. Ct. 1731 (2020). Justice Gorsuch's majority opinion in *Bostock* emphasized that "no court should ever" dispense with a statutory text "to do as we think best," adding, "the same judicial humility that requires us to refrain from adding to statutes requires us to refrain from diminishing them." *Id.* at 1753. Yet that is exactly what the Court has done with § 1983.

[267] *See Janus v. AFSCME, Council 31*, 138 S. Ct. 2448, 2481 (2018); *June Med. Servs.*, 2020 WL 3492640, at *22 (Roberts, C.J., concurring).

### B.        Section 1981 and Mr. Dulin

Section 1981 "prohibits racial discrimination in making and enforcing contracts."[268] It reads,

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.[269]

You don't need a lawyer to understand this statute. The language is simple and direct. It calls for "full and equal benefit of all laws and proceedings" regardless of race.

A few years ago, George Dulin invoked this law in a suit he brought against his former employer. Dulin was a white attorney in the Mississippi Delta. He had represented the local hospital board for 24 years. When he was replaced by a Black woman, Dulin claimed that the Board had discriminated against him on the basis of race. He said that no Board member had complained about his job performance, some of the

---

[268] *White Glove Staffing, Inc. v. Methodist Hosps. of Dallas*, 947 F.3d 301, 308 (5th Cir. 2020) (citation omitted).

[269] 42 U.S.C. § 1981(a). "[W]hile the statutory language has been somewhat streamlined in re-enactment and codification, there is no indication that § 1981 is intended to provide any less than the Congress enacted in 1866 regarding racial discrimination against white persons." *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 296 (1976).

Board members had made racist remarks, and he was better qualified than his replacement.[270]

Despite being simply stated, Section 1981 is not simply enforced. In Section 1981, as with its cousin Section 1983, federal judges have invented extra requirements for plaintiffs to overcome before they may try their case before a jury.

In Dulin's case, the trial judge and two appellate judges thought he couldn't overcome those extra hurdles. Specifically, the Fifth Circuit majority explained that although some evidence showed that no one *complained* about Dulin's job performance, other evidence revealed that the Board was *silently* dissatisfied with his work.[271] They held that Dulin's evidence of racist remarks was from too long ago—it failed the "temporal proximity" requirement.[272] Then they found that his evidence of superior qualifications could not overcome a legal standard which says that "differences in qualifications are generally not probative evidence of discrimination unless those disparities are of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question."[273] For the moment, Dulin had lost.

---

[270] *Dulin v. Bd. of Comm'rs of Greenwood Leflore Hosp.*, 586 F. App'x 643, 645-46 (5th Cir. 2014).

[271] *See George Dulin v. Bd. of Comm'rs of Greenwood Leflore Hosp.*, No. 10-60095, slip op. at 6 (5th Cir. July 8, 2011).

[272] *Id.* at 7.

[273] *Id.* at 11 (quotations and citation omitted). This standard is awfully subjective.

To be clear, these judges in the majority hadn't "gone rogue." They were simply attempting to follow precedent that had long since narrowed the scope of Section 1981.

Judge Rhesa Barksdale filed a 22-page dissent. He argued that the many factual disputes should be resolved by a jury, given the Seventh Amendment right to jury trials.[274] He wrote that the temporal proximity test was too stringent since a savvy Board could have "*purposely* waited a year to terminate Dulin in order for that decision not to appear to be motivated by race."[275] He noted the evidence suggesting that the Board was lying about its motives, since "the Board never discussed Dulin's claimed poor performance."[276] Judge Barksdale then flatly disagreed that the court "must apply the superior-qualifications test," given evidence that the Board never cared to even discuss the qualifications of Dulin's replacement.[277] He "urged" the full court to rehear the case en banc.[278]

Judges err when we "impermissibly substitute[]" a jury determination with our own—the Seventh Amendment tells us so.[279] We err again when we invent legal requirements that are untethered to the complexity of the real world.[280] The truth is,

---

[274] *Id.* at 13-14 (Barksdale, J., dissenting).

[275] *Id.* at 26.

[276] *Id.* at 30.

[277] *Id.* at 32–33.

[278] *Id.* at 34.

[279] *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 153 (2000); *see also Vance v. Union Planters Corp.*, 209 F.3d 438, 442 n.4 (5th Cir. 2000).

[280] The most confounding made-up standard might have been from the Eleventh Circuit. For years, that court held that a plaintiff could prove discrimination based on her superior qualifications "only when the disparity

Section 1981 doesn't have a "temporal proximity" requirement. It says everyone in this country has "the same right . . . to the full and equal benefit of all laws and proceedings for the security of persons and property." We should honor it.

Judge Barksdale's powerful defense of the Seventh Amendment eventually persuaded his colleagues. They withdrew their opinion and issued in its place a two-paragraph, per curiam order directing the district court to hold a full trial on Dulin's claims.[281] Dulin subsequently presented his case to a jury of his peers, and the judiciary didn't collapse under a flood of follow-on litigation.[282] That he won his trial hardly matters: the case affirmed Judge Browning's point that "jury trials are the most democratic expression" of which official acts are reasonable and which are excessive.[283, 284]

---

[281] *See Dulin v. Bd. of Comm'rs of Greenwood Leflore Hosp.*, 657 F.3d 251, 251 (5th Cir. 2011).

[282] We have many tools at our disposal to stop frivolous suits at any stage of litigation. *See, e.g.*, 28 U.S.C. § 1915; Fed. R. Civ. P. 11, 12, 37, and 56; *Link v. Wabash R. Co.*, 370 U.S. 626, 629 (1962). Even after a jury has reached a verdict, a judge may set aside the decision or take other corrective actions if the judge believes a reasonable jury could not have reached the decision. *See, e.g.*, Fed. R. Civ. P. 50, 59 and 60. And where the trial court errs, the appellate court is given the opportunity to correct.

[283] *Manzanares*, 331 F. Supp. 3d at 1294 n.10.

[284] The Court recognizes that juries have not always done the right thing. As the Supreme Court noted in *Ramos*, some states created rules regarding jury verdicts that can be "traced to the rise of the Ku Klux Klan and efforts to dilute 'the influence of racial, ethnic, and religious minorities'" on their

in qualifications is so apparent as virtually to jump off the page and *slap you in the face.*" *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456-57 (2006) (emphasis added) (quotations and citation omitted). The Supreme Court eventually rejected the standard as "unhelpful and imprecise." *Id*. at 457.

I have told this story today because of its obvious parallels with § 1983. In both situations, judges took a Reconstruction-era statute designed to protect people *from the government*, added in some "legalistic argle-bargle,"[285] and turned the statute on its head to protect the government *from the people*. We read § 1983 against a background of robust immunity instead of the background of a robust Seventh Amendment.[286] Then we added one judge-made barrier after another. Every hour we spend in a § 1981 case trying to parse "temporal proximity" is a distraction from the point of the statute: to determine if there was unlawful discrimination. Just as every hour we spend in a § 1983 case asking if the law was "clearly established" or "beyond debate" is one where we lose sight of why

---

juries. 140 S. Ct. at 1394. As other courts have noted, "racial discrimination remains rampant in jury selection." *State v. Saintcalle*, 178 Wash. 2d 34, 35 (2013), *abrogated on other grounds by City of Seattle v. Erickson*, 188 Wash. 2d 721 (2017). Like any actor in our legal system, juries may succumb to "unintentional, institutional, or unconscious" biases. *Id.* at 36. However, the federal courts' adoption and expansion of qualified immunity evinces an obvious institutional bias in favor of state actors. With its more diverse makeup relative to those of us who wear the robe, a jury is best positioned to "decide justice." Paul Butler, *Racially Based Jury Nullification: Black Power in the Criminal Justice System*, 105 YALE L.J. 677, 701-02 (1995) (citation omitted); *see also* Danielle Root et al., *Building a More Inclusive Federal Judiciary*, CTR. FOR AM. PROGRESS (Oct. 3, 2019) ("Today, more than 73 percent of sitting federal judges are men and 80 percent are white. Only 27 percent of sitting judges are women . . . . while Hispanic judges comprise just 6 percent of sitting judges on the courts. Judges who self-identify as LGBTQ make up fewer than 1 percent of sitting judges.") (citations omitted).

[285] *United States v. Windsor*, 570 U.S. 744, 799 (2013) (Scalia, J., dissenting).

[286] Afterall, "[q]uite simply, jurors are the life's blood of our third branch of government." *Marchan v. John Miller Farms, Inc.*, 352 F. Supp. 3d 938, 947 (D. N.D. 2018) (citation omitted).

Congress enacted this law those many years ago: to hold state actors accountable for violating federally protected rights.

There is another, more difficult reason I have told this story, though. When the Fifth Circuit withdrew its first opinion, Westlaw deleted it and the accompanying dissent. Other attorneys and judges have thus never had the benefit of Judge Barksdale's analysis and defense of the Seventh Amendment—one forceful enough to persuade his colleagues to reverse themselves.[287] That is a loss to us all.

And, although the panel in *Dulin* ultimately permitted the case to proceed to a jury trial, this fell short of equal justice under the law. Instead of seeking en banc review to eliminate the judge-created rules that prohibited Mr. Dulin's case from moving forward, the panel simply decided his case would be an exception to the rules. They provided no explanation as to why an exception, rather than a complete overhaul, was appropriate. The "temporal proximity" requirement still applies to § 1981 claims in the Fifth Circuit today. *Dulin* shows us an example of judges recognizing the inconsistencies and impracticalities of an invented doctrine, but not going far enough to correct the wrong.

In *Dulin*, federal judges decided that a Reconstruction-era law could accommodate the claims of an older, white, male attorney. They had the imagination to see how their constricting view of § 1981 harmed someone who shared the background of most federal judges. That same imagination must be used to resuscitate § 1983 and remove the impenetrable shield of protection handed to wrongdoers.

---

[287] Fortunately, the dissent is readily found on Google searches and an official copy was preserved on the District Court's docket.

Instead of slamming shut the courthouse doors, our courts should use their power to ensure Section 1983 serves all of its citizens as the Reconstruction Congress intended. Those who violate the constitutional rights of our citizens must be held accountable. When that day comes we will be one step closer to that more perfect Union.

## VII.   Conclusion

Again, I do not envy the task before the Supreme Court. Overturning qualified immunity will undoubtedly impact our society. Yet, the status quo is extraordinary and unsustainable. Just as the Supreme Court swept away the mistaken doctrine of "separate but equal," so too should it eliminate the doctrine of qualified immunity.

Earlier this year, the Court explained something true about wearing the robe:

> Every judge must learn to live with the fact he or she will make some mistakes; it comes with the territory. But it is something else entirely to perpetuate something we all know to be wrong only because we fear the consequences of being right.[288]

Let us waste no time in righting this wrong.

Officer McClendon's motion is **GRANTED**, and the remaining claim in this matter will be set for trial in due course.

**SO ORDERED**, this the 4th day of August, 2020.

s/ CARLTON W. REEVES
*United States District Judge*

---

[288] *Ramos*, 140 S. Ct. at 1408.

72